Hui Xu, *pro se*
584 Lynnbrook Drive
Eugene, Oregon 97404
Email: huifanti@gmail.com
Tel. (541) 579-7030
*Plaintiff, pro se*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

#### District of Eugene

| | |
|---|---|
| **HUI XU**, an individual,<br><br>                    Plaintiff,<br><br>          v.<br><br>**LIGHTSMYTH TECHNOLOGIES, INC.,** a Delaware corporation, **FINISAR CORPORATION**, a Delaware corporation,<br><br>                    Defendants. | Case No. ___6:20-cv-01201-MC___<br><br>**COMPLAINT**<br>Race Discrimination, National Origin Discrimination, Disability Discrimination, Age Discrimination, Violations of Whistleblowing Laws, Wrongful Discharge<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Hui Xu ("Plaintiff") alleges:

### PARTIES

1.

Plaintiff is a resident of Lane County, Eugene, Oregon.

2.

Defendant LightSmyth Technologies, Inc., ("LightSmyth") is a foreign business corporation registered in Delaware, with its principal place of business in Lane County, Eugene, Oregon. LightSmyth is a wholly owned subsidiary of Finisar Corporation ("Finisar"), a foreign

business corporation registered in Delaware with its principal place of business located in

Sunnyvale, California.  LightSmyth and Finisar will hereinafter collectively be referred to as

"Defendants."

JURISDICTION AND VENUE

3.

Plaintiff requests a jury trial in this matter.

4.

Pursuant to 28 U.S.C. § 1331, jurisdiction is appropriate for this court because Plaintiff

brings a civil action under the Constitution, laws, or treaties of the United States.  Jurisdiction is

also appropriate in this court pursuant to 38 U.S.C. § 4323(b)(3).  This court has supplemental

jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  Plaintiff's state law

claims are so closely related to her federal law claims that they form part of the same case or

controversy under Article III of the United States Constitution.

5.

Venue is appropriate in the United States District Court, District of Oregon, Eugene

Division, because the events giving rise to Plaintiff's *Complaint* occurred primarily in Lane

County, Eugene, Oregon.  Venue is also appropriate pursuant to 38 U.S.C. § 4323(c)(2) because

Defendant maintains a place of business in Lane County, Eugene, Oregon.

6.

Plaintiff filed a complaint with the Bureau of Labor and Industries ("BOLI"), which was

received by BOLI on April 25, 2019, and assigned Case No. DPEMDP190425-50631.  The

matter was dual-filed with the Equal Employment Opportunity Commission ("EEOC").  Plaintiff

received a 90-day notice of her right to sue from BOLI by letter dated April 24, 2020.  The

EEOC has not yet issued its right to sue letter. This *Complaint* was filed prior to the 90-day period ending.

FACTUAL ALLEGATIONS

7.

Plaintiff is a sixty-five (65) year old female whose race is Asian and whose nation of origin is China.

8.

Plaintiff suffers a physical impairment to her eye that substantially limits her ability to focus on objects at a short distance, as well as from amblyopia, commonly referred to as "lazy eye," which is a physical impairment to her eye that substantially limits her ability to see out of one of her eyes.

9.

Defendants develop and manufacture diffraction gratings used in optical instruments (i.e. spectrometers), among other patented items used in fiber optic communications. Finisar is headquartered in California. LightSmyth is Finisar's manufacturing, research, and development facility in Eugene, Oregon.

10.

Plaintiff started employment with LightSmyth in 2012 after which Finisar acquired LightSmyth in or around May 2014.

11.

In or around January 2012, LightSmyth hired Plaintiff as a Manufacturing Technician whose main duty was optical efficiency ("OE") testing. In or around April 2012, LightSmyth promoted Plaintiff to a Supply Chain Manager position and provided her with a $5 per hour

wage increase.  Plaintiff had no managerial, administrative, or executive responsibilities for Defendants.

12.

Plaintiff's primary job duties as a Supply Chain Manager included, but were not limited to: OE testing, supply management, preparing shipping documents, OE reports, working closely with accounting staff to ensure purchase orders are placed accurately and on-time.  As a Supply Chain Manager, Plaintiff also worked in the clean room.

13.

Plaintiff was not required to conduct visual inspections as a Supply Chain Manager.

14.

At all times relevant, Plaintiff performed her job duties in a satisfactory manner. Defendants recognized and acknowledged Plaintiff's satisfactory performance on multiple occasions, often commenting that Plaintiff was a hardworking and reliable employee.

15.

Plaintiff's job duties did not include supervision and did not require advanced knowledge.  Metrics and goals were set by Defendant, in part, so Plaintiff did not need to exercise consistent discretion and judgment regarding her job duties.  Defendants paid Plaintiff on a salary basis and did not provide Plaintiff with overtime compensation at time-and-a-half for hours worked over 40 per week.

16.

At all times relevant, Plaintiff was employed by Defendant at its Eugene, Oregon location.

17.

In or around June 2016, Manufacturing Supervisor, Catherine Brown ("Supervisor Brown"), started serving as one of Plaintiff's supervisor.

18.

In or around October 2016, Defendants transferred Plaintiff's Supply Chain Manager job duties to a younger, Caucasian, male with significantly less LightSmyth inventory control experience than Plaintiff.

19.

On or around November 2, 2016, Plaintiff notified Clean Room Lead Liza Dayton ("Lead Dayton") that she had medical issues with her eyes and requested a magnifying glass with a light to help her put labels on products. Approximately two hours after Plaintiff notified Lead Dayton of her disability, Lead Dayton complained in front of Plaintiff's co-workers, "Hui has difficulty putting labels on." Plaintiff was insulted, humiliated, embarrassed, and angered by Lead Dayton's conduct. Plaintiff previously notified Supervisor Brown that Plaintiff had difficulty seeing due to eye function and Plaintiff requested a magnifying glass and light as an accommodation that would allow her to perform her essential job functions.

20.

By email to Supervisors Brown and Dayton on November 14, 2016, Plaintiff presented the fact that she had worked overtime without overtime pay, worked more than 8 hours in the Clean Room, and did not have any breaks all day except a 20-minute working lunch when she worked on computer issues. Plaintiff also complained about Lead Dayton's comment regarding Plaintiff's disability in front of her co-workers and asked why Lead Dayton criticized Plaintiff for certain conduct when other employees were engaging in the same conduct without criticism.

Plaintiff specifically asked why Lead Dayton treated her differently than she treated other employees.  Upon information and belief, on or around November 15, 2016, Supervisor Brown emailed HR Sheila Roberts asking HR to fire Plaintiff.  Supervisor Brown issued a disciplinary *Improvement Plan* to Plaintiff shortly thereafter, dated November 28, 2016.

21.

On or around November 28, 2016, Defendants provided Plaintiff with a performance improvement plan alleging that Plaintiff engaged in horseplay.  Defendants knew or should have known that Plaintiff and others engaged in horseplay in the workplace.  Plaintiff asked whether Lead Dayton was going to be disciplined because she slapped Plaintiff's buttocks and choked her before.  Upon information and belief, Defendants did not take any remedial action with Lead Dayton for the same alleged conduct as Plaintiff.  Defendants only disciplined Plaintiff after she notified Defendants of her disability, request for accommodations, and complained about disparate treatment in the workplace.  Defendant's disciplinary action chilled Plaintiff's complaints for a couple months.

22.

On or around February 17, 2017, Plaintiff submitted an email complaint to HR about a hostile work environment based on gender.  Plaintiff noted that Lead Dayton was rude and disrespectful toward Plaintiff but not to male colleagues. Plaintiff expressed that she believed Supervisor Brown wanted to terminate her employment with Defendants.  Plaintiff pointed to numerous examples where her colleagues had cost Defendants several thousands of dollars without consequence, yet Plaintiff was being reprimanded for asking her supervisor for confirmation that she had completed a task.

23.

On or around March 2, 2017, Defendants confirmed assignment of Plaintiff's prism inventory management duties to a younger, Caucasian, male colleague. Defendants left Plaintiff to perform the work of a Manufacturing Technician and assigned her packaging duties. On or around that same date, Liza Dayton ("Lead Dayton") became Plaintiff's Clean Room Team Lead and direct supervisor – after Plaintiff had made several complaints about the way in which Lead Dayton treated her. Supervisor Brown later stated that she placed her on packaging duty because Plaintiff's doctor placed restrictions on her ability to perform her job functions, which was not true.

24.

On or around April 11, 2017, Plaintiff requested disability accommodations for her cataracts including her doctor's request that she receive "frequent breaks from looking through the microscope and should be excused from looking through the scope for continuous periods greater than 30 minutes at a time."

25.

On or around May 3, 2017, Plaintiff had cataract surgery on her left eye (the lazy eye).

26.

On or around June 4, 2017, Plaintiff complained by email to her supervisors that Lead Dayton was including donning and doffing in her break time. Plaintiff had to wear a gown in the Clean Room. During her breaks she would need to "gown down," take a break, "gown up," and return to work. Lead Dayton included Plaintiff's gowning time in her break. Plaintiff also reported that Lead Dayton was stealing company time by clocking-in after her allotted lunch period and then going back to her car in the parking lot.

27.

On or around July 20, 2017, Plaintiff had cataract surgery on her right eye (the good eye).

28.

On or around July 21, 2017, and July 28, 2017, Plaintiff complained to HR that the salary increase and bonus she received were not in alignment with normal annual increases and bonuses. Plaintiff complained that Defendants' demotion of her position back to a Manufacturing Technician and packaging restricted her annual merit increases and bonuses. Plaintiff also complained that Lead Dayton was forcing her to take breaks when Plaintiff understood that Defendants viewed her as a salaried exempt employee.

29.

On or around August 17, 2017, Plaintiff complained to HR that she had been demoted, the environment was hostile toward her, and that it negatively affected her health. Plaintiff notified HR that Defendants reduced her duties to stuffing packages all day; that Lead Dayton was collecting overtime pay without doing overtime work, that Plaintiff was working 10-12 hours per day without overtime pay; and that Lead Dayton was trying to compel Plaintiff to take breaks.

30.

On November 8, 2017, Lead Dayton instructed Plaintiff to double-package approximately 50 individual failed gratings using packing remnants. The normal procedure would be to place all failed gratings into one bag. On or around November 14, 2017, Lead Dayton instructed Plaintiff to cut open all of the double-packed failed gratings she had packaged the week before and stuff them into one bag. Plaintiff asked why Lead Dayton had her double-package all the failed gratings individually if they were just going to follow normal procedure and Lead Dayton

responded, "To keep you busy." At least three younger Caucasian males were not made to only use remnants to package and were allowed to use ready-made packaging sleeves.

31.

On or around November 17, 2017, Supervisor Brown berated Plaintiff in front of other employees for being unable to make her 3 p.m. quota.

32.

On or around February 25, 2018, Plaintiff sent an email to HR and complained about a hostile work environment, discrimination, retaliation, and requested a new supervisor. Specifically, Plaintiff reported that she was the only employee whom Supervisors Brown and Dayton required to use remnants packaging for product packaging. By its nature, remnant packaging slowed Plaintiff's production and made it significantly more physically taxing to seal the packages. Plaintiff estimates it took her ten-times the effort to package material than it did other employees because Defendants required her to use remnants for packaging and Plaintiff learned that Defendants were not requiring the younger Caucasian males to use remnants to do packaging. Plaintiff also reported that her job duties had been reduced to packing and cleaning dishes. Plaintiff's supervisors provided her with broken equipment and failed to replace it, causing Plaintiff to have to work four-to-six-times as hard and twice as long to seal one bag than it took other employees who had working equipment. Supervisors Brown and Dayton would then yell at Plaintiff for not completing the work in a timely manner when they knew or should have known it would not be possible under the conditions they created for Plaintiff. Plaintiff reported that she believed Supervisors Brown and Dayton were treating her this way because of her Chinese national origin, gender, age, and disability.

33.

By letter dated March 15, 2018, Plaintiff's doctor notified Defendants that Plaintiff's cataract surgery prevented her from being able to perform visual inspections. On or around March 22, 2018, Supervisor Brown informed Plaintiff that Defendants would be restructuring Plaintiff's job to accommodate her disabilities. Defendants did not ask Plaintiff if there were any accommodations they could provide that would allow her to be able to perform visual inspections. Defendants' restructuring consisted of making Plaintiff a packaging clerk and dishwasher, which were more physically demanding and less prestigious jobs. Plaintiff became the sole packager whereas the job was done by two or more technicians before the task was assigned to Plaintiff. Upon information and belief, Plaintiff was not being paid wages commensurate with those of other employees performing work of similar character. Upon the alleged restructuring, Defendants instructed Plaintiff vacate her cubicle to allow for another colleague to use it. This behavior caused Plaintiff great embarrassment and stress.

34.

Defendants treated Plaintiff as an exempt employee for wage purposes since 2012. From 2012 to March 2017, Plaintiff was consistently working 10 to 20 hours of overtime each week. By February 2017, Defendants had removed most of Plaintiff's technical job duties and Plaintiff worked several overtime hours. Defendants did not compensate Plaintiff for overtime, despite her raising concerns that she was working overtime without pay on multiple occasions.

35.

On or around March 26, 2018, after Plaintiff complained about the discrimination and retaliation on February 25, 2018, Supervisor Brown notified Plaintiff that Defendant was changing Plaintiff's job title from "Supply Chain Manager" back to "Manufacturing

Technician." Supervisor Brown indicated that the demotion was based on Plaintiff's doctor's note and her assessment that Plaintiff was no longer able to perform the essential job functions of a Supply Chain Manager because she could "no longer perform any visual inspections." The Supply Chain Manager does not conduct visual inspections and it was not an essential job function of the Supply Chain Manager. Plaintiff could create OE reports, which was an essential job function, but Defendants did not want Plaintiff to do that work.

36.

On or around April 20, 2018, Supervisor Brown issued an oral and written warning to Plaintiff about her failure to meet production quotas. Defendants provided Plaintiff with positive written performance reviews but yelled at Plaintiff, demeaned her, gave her menial tasks, and treated her like she was less worthy of respect than her younger Caucasian male colleagues.

37.

On or around April 26, 2018, Defendants removed Plaintiff's overtime exempt status and characterized her as an hourly non-exempt employee. Up until that point, Defendants had been paying Plaintiff a set salary without regard to how many hours Plaintiff worked. Defendants used Plaintiff's new non-exempt status to harass Plaintiff. Lead Dayton regularly and systemically criticized, questioned, and scrutinized Plaintiff's breaks when she did not question other employees who took similar breaks. Upon information and belief, Defendants were trying to create such an uncomfortable and hostile work environment for Plaintiff with the objective to get her to quit.

38.

As a direct and proximate result of the conduct of Defendants and their managerial employees, Plaintiff's physical health deteriorated and her doctor reported that her blood

pressure was "abnormally high" by October 15, 2018. In or around November 2018 Plaintiff was being treated for accelerated hypertension, depression with anxiety, and recurrent shingles exacerbated by workplace harassment.

39.

On or around November 11, 2018, and November 12, 2018, Plaintiff requested a new supervisor due to the impact her supervisors' harassment and discrimination had on her health.

40.

On or around November 13, 2018, HR informed Plaintiff that she was removed from her salaried position due to the limitations presented by her disabilities. HR informed Plaintiff that they did not find any unlawful discrimination and "we will not do any further investigation of these matters, and we consider them closed."

41.

On or around November 16, 2018, HR called Plaintiff by telephone to confirm that Defendants found no unlawful conduct on their part and that no alternative positions were available. HR (Neel Dhar) asked Plaintiff to "resign and leave with dignity".

42.

On or around February 24, 2019, Plaintiff applied for Family Medical Leave Act ("FMLA") leave to care for her sibling. Defendants provided 30-days of personal leave. Plaintiff requested extended leave but Defendants did not agree to extended leave and Plaintiff informed Defendants she could not return to work.

43.

Defendants refused to allow Plaintiff to report to another supervisor despite her deteriorating health condition caused by Defendants' failure to stop hostile behavior toward

Plaintiff.  Plaintiff did not feel that she could continue working for Defendants without risking her life due to the health conditions she experienced as a result of the stress caused by work.  As a result of Defendants' unlawful conduct, Plaintiff felt she had no reasonable alternative but to separate from employment on March 25, 2019.

CLAIMS FOR RELIEF

**First Claim: Violations of ORS 659A.030(1)(a),(b)**

**(Discrimination: Race, Sex, National Origin, Age)**

44.

Plaintiff realleges and incorporates paragraphs 1 through 43 herein by this reference. Pursuant to ORS 659A.030(1)(a), (b), it is an unlawful employment practice for an employer, because of an individuals' race, sex, national origin, or age to discharge the individual from employment or to discriminate against the individual in compensation or in terms, conditions or privileges of employment.  Defendants constructively discharged and discriminated against Plaintiff in her compensation, terms, and conditions of employment as described in the paragraphs above.

45.

As a result of Defendant's unlawful conduct, Plaintiff suffered economic damages in the form of lost wages in the amount of $53,000, which amount continues to accrue at a monthly rate of $3,400, as well as non-economic damages in the amount of $200,000 to be proven at trial and in the form of emotional distress as set forth in the paragraphs above.  Plaintiff requests her economic and non-economic damages, costs, disbursements, and any other relief this court deems just and equitable.

**Second Claim: Violations of ORS 659A.199**

**(Discrimination/Retaliation: Report Evidence of Violation of Law, Rule, Regulation)**

46.

Plaintiff realleges and incorporates paragraphs 1 through 45 herein by this reference. Pursuant to ORS 659A.199, , "It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation." Defendant constructively discharged and discriminated and retaliated against Plaintiff regarding promotion, compensation, and other terms and conditions of employment as described in the paragraphs above, because Plaintiff made good faith reports of age, sex/gender, race, and national origin discrimination/hostile work environment, retaliation, theft, and violations of state and federal equal pay and overtime laws as described in the paragraphs above in violation of ORS 659A.199.

47.

As a result of Defendant's unlawful conduct, Plaintiff suffered economic damages in the form of lost wages in the amount of $53,000, which amount continues to accrue at a monthly rate of $3,400, as well as non-economic damages in the amount of $200,000 to be proven at trial and as set forth in the paragraphs above.  Plaintiff requests her economic and non-economic damages, costs, disbursements, and any other relief this court deems just and equitable.

**Third Claim: Violations of ORS 659A.112**

**(Count 1: Terms, Conditions, Privileges)**

48.

Plaintiff realleges paragraphs 1 through 47, which are incorporated herein by this reference.  Pursuant to ORS 659A.112(1), "It is an unlawful employment practice for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to discriminate in compensation or in terms, conditions or privileges of employment on the basis of disability."  Defendants violated ORS 659A.112 when they discriminated against Plaintiff in the compensation, terms, and conditions of her employment, as described in the paragraphs above, because of her disability.

49.

As a result of Defendants' unlawful conduct, Plaintiff suffered severe emotional distress as described in the paragraphs above.  Plaintiff requests her economic damages in the amount of $53,000, which damages continue to accrue at a rate of $3,400 per month, non-economic damages in the amount of $200,000, equitable relief in the form of reinstatement with backpay, front pay in an amount the court deems just and equitable, reasonable costs and attorney fees, and any other equitable relief that the court deems appropriate pursuant to ORS 659A.885.

**(Count 2: Reasonable Accommodation)**

50.

Plaintiff realleges paragraphs 1 through 49, which are incorporated herein by this reference.  Pursuant to ORS 659A.112(1), (2)(e), "It is an unlawful employment practice for any employer to … not make reasonable accommodation to the known physical or mental limitations of a qualified individual with a disability who is a job applicant or employee, unless the

employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer." Plaintiff is an individual with a disability who was qualified for the Supply Chain Manager position. Defendants violated ORS 659A.112(1), (2)(e) when they failed to make reasonable accommodations for Plaintiff's known physical limitations when reasonable accommodations were available, as described in the paragraphs above.

51.

As a result of Defendants' unlawful conduct, Plaintiff suffered severe emotional distress as described in the paragraphs above. Plaintiff requests her economic damages in the amount of $53,000, which damages continue to accrue at a rate of $3,400 per month, non-economic damages in the amount of $500,000, equitable relief in the form of reinstatement with backpay, front pay in an amount the court deems just and equitable, reasonable costs and attorney fees, and any other equitable relief that the court deems appropriate pursuant to ORS 659A.885.

**Fourth Claim: Violations of ORS 659A.030(1)(f)**

**(Retaliation: Opposing Unlawful Employment Practices)**

52.

Plaintiff realleges paragraphs 1 through 51, which are incorporated herein by this reference. Pursuant to ORS 659A.030(1)(f), it is an unlawful employment practice: "For any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so." Plaintiff opposed several unlawful practices, as outlined in the paragraphs above, including violations or ORS 653.060(1)(a) (overtime), ORS 659A.030(1)(race, gender, age), ORS 659A.199 (retaliation), ORS 659A.030(1)(f) (retaliation), ORS 659A.112 (disability). Defendants

discriminated against Plaintiff as described in the paragraphs above because of her opposition to those unlawful practices.

53.

As a result of Defendants' unlawful conduct, Plaintiff suffered severe emotional distress as described in the paragraphs above. Plaintiff requests her economic damages in the amount of $53,000, which damages continue to accrue at a rate of $3,400 per month, non-economic damages in the amount of $500,000, equitable relief in the form of reinstatement with backpay, front pay in an amount the court deems just and equitable, reasonable costs and attorney fees, and any other equitable relief that the court deems appropriate pursuant to ORS 659A.885.

### Fifth Claim: Wrongful Discharge

54.

Plaintiff realleges and incorporates paragraphs 1 through 53 herein by this reference. Public policy abhors discrimination and hostility in the workplace to the point an employee has no other reasonable alternative but to quit. Defendant constructively discharged Plaintiff because she attempted to enforce her statutory right to be free from discriminatory conduct and hostility due to her race, age, disability, national origin, and whistleblowing activity. Plaintiff has suffered economic damages in the form of back pay, front pay, and non-economic damages in the amount of $200,000 to be proven at trial. Plaintiff requests reinstatement and her economic damages in the form of front pay in an amount to be determined at trial, back pay in the amount of $5,000, and her non-economic damages in the amount of $200,000.

## Sixth Claim: Violations of 42 U.S.C. § 2000e-2

### (Race, Sex, National Origin)

55.

Plaintiff realleges and incorporates paragraphs 1 through 54 herein by this reference. Pursuant to 42 U.S.C. § 2000e-2, it is "an unlawful employment practice for an employer … to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or… (2) to limit, segregate, or classify his employees… in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." Defendants constructively discharged and discriminated against Plaintiff regarding her compensation, terms, conditions, and privileges of employment because of her race, sex, and national origin as described in the paragraphs above.

56.

As a result of Defendants' unlawful conduct, Plaintiff suffered severe emotional distress as described in the paragraphs above. Plaintiff requests her economic damages in the amount of $53,000, which damages continue to accrue at a rate of $3,400 per month, non-economic damages in the amount of $500,000, equitable relief in the form of reinstatement with backpay, front pay in an amount the court deems just and equitable, reasonable costs and attorney fees, and any other equitable relief that the court deems appropriate pursuant to 29 U.S.C. § 2000e-5.

### Seventh Claim: Violations of 42 U.S.C. § 12112

57.

Plaintiff realleges and incorporates paragraphs 1 through 56 herein by this reference.
Pursuant to 42 U.S.C. § 12112, it is unlawful for an employer to "discriminate against a qualified
individual on the basis of disability in regard to job application procedures, the hiring, advancement,
or discharge of employees, employee compensation, job training, and other terms, conditions, and
privileges of employment." Defendants constructively discharged and discriminated against Plaintiff
regarding her advancement, discharge, and other terms, conditions and privileges of employment
because of her disability as described in the paragraphs above.

58.

As a result of Defendants' unlawful conduct, Plaintiff suffered severe emotional distress
as described in the paragraphs above.  Plaintiff requests her economic damages in the amount of
$53,000, which damages continue to accrue at a rate of $3,400 per month, non-economic
damages in the amount of $500,000, equitable relief in the form of reinstatement with backpay,
front pay in an amount the court deems just and equitable, reasonable costs and attorney fees,
and any other equitable relief that the court deems appropriate.

### Eighth Claim: Violations of ORS 653.060(1)(a)

59.

Plaintiff realleges and incorporates paragraphs 1 through 58 herein by this reference.
Pursuant to ORS 653.060(1)(a), "An employer may not discharge or in any other manner
discriminate against an employee because… the employee has inquired about the provisions
of…ORS 653.261..or has reported a violation of… ORS 653.261…." Defendants constructively

discharged and discriminated against Plaintiff because she inquired about and reported violations of overtime laws as described in the paragraphs above.

60.

As a result of Defendants' unlawful conduct, Plaintiff suffered severe emotional distress as described in the paragraphs above.  Plaintiff requests her economic damages in the amount of $53,000, which damages continue to accrue at a rate of $3,400 per month, non-economic damages in the amount of $500,000, equitable relief in the form of reinstatement with backpay, front pay in an amount the court deems just and equitable, reasonable costs and attorney fees, and any other equitable relief that the court deems appropriate. ORS 659A.885.

**Eleventh Claim: Violations of 29 U.S.C. § 623 (ADEA)**

61.

Plaintiff realleges and incorporates paragraphs 1 through 60 herein by this reference. Pursuant to 29 U.S.C. § 623, "It shall be unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." Defendants constructively discharged and discriminated against Plaintiff with respect to her compensation, terms, conditions, or privileges of employment because of her age as described in the paragraphs above.

62.

As a result of Defendants' unlawful conduct, Plaintiff suffered severe emotional distress as described in the paragraphs above.  Plaintiff requests her economic damages in the amount of $53,000, which damages continue to accrue at a rate of $3,400 per month, non-economic damages in the amount of $500,000, equitable relief in the form of reinstatement with backpay,

front pay in an amount the court deems just and equitable, reasonable costs and attorney fees, and any other equitable relief that the court deems appropriate. 29 U.S.C. § 626(b).

## REQUESTED RELIEF

**WHEREFORE**, Plaintiff requests the following relief:

1.  Economic damages, including lost wages, back pay, front pay, and benefits in the amount of $53,000, which amount continues to accrue;

2.  Non-economic damages in an amount to be proven at trial, which sum is alleged to be $200,000;

3.  Reasonable attorney fees, expert witness fees, and other litigation expenses;

4.  Any other relief that this court deems just and equitable.

Dated: July 22, 2020.

/s/ Hui Xu
Hui Xu, *pro se*
huifanti@gmail.com
*Plaintiff, pro se*