IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

HUI XU, *an individual*,                                  Case No.: 6:20-cv-01201-MC

            Plaintiff,

vs.                                                      OPINION AND ORDER

LIGHTSMYTH TECHNOLOGIES, INC.,
*a Delaware Corporation*, *and* FINISAR, *a
Delaware Corporation*,

            Defendants.

_____

MCSHANE, J.:

        Plaintiff Hui Xu brings this employment action against Defendants Lightsmyth

Technologies, Inc., and Finisar Corporation, asserting claims of discrimination, retaliation,

hostile work environment, wrongful discharge, and failure to provide reasonable

accommodation. Pl.'s Compl. ¶¶ 44–62, ECF No. 1. On December 27, 2022, Defendants moved

for summary judgment pursuant to Federal Rule of Civil Procedure 56. Defs.' Mot. Summ. J.,

ECF No. 62. For the following reasons, Defendants' Motion is GRANTED.

## BACKGROUND

        LightSmyth is a Eugene, Oregon based manufacturing company and subsidiary of Finisar

Corporation. Pl.'s Compl. ¶ 2. In January of 2012, Plaintiff began working for LightSmyth as a

Manufacturing Technician, and was later promoted to Supply Chain Manager. Pl.'s Compl. ¶¶

10–11. While at Lightsmyth, Plaintiff earned a reputation for being a difficult coworker and

1 – OPINION AND ORDER

employee; her former colleagues describe her as confrontational, defensive, insulting, and incapable of accepting criticism. Berg Decl. Ex. 2, at 8, ECF No. 63; Berg Decl. Ex. 5, at 4 ("[S]he was confrontational. She liked to yell and scream repeatedly."); Berg Decl. Ex. 24, at 2 (If it's a job that she doesn't like . . . she started getting very argumentative and she would insult people."). Despite her own problematic behavior, Plaintiff frequently reported trivial personal disagreements with her coworkers to Human Resources, often characterizing her work environment as hostile, toxic, and discriminatory, based on her protected status as a 65-year-old Asian woman. *See e.g.*, Berg. Decl. Ex. 18, at 1, 11; Pl.'s Compl. ¶ 7. Plaintiff estimates that she made about 80-100 reports to HR during her employment. Berg Decl. Ex. 1, at 62.

The complaints escalated in June of 2016, when Defendants assigned Catherine Brown as Plaintiff's new supervisor. Pl.'s Compl. ¶ 17. This relationship was strained from the beginning; Plaintiff repeatedly voiced her opinion that Ms. Brown was unqualified to supervise Plaintiff and her peers. *See* Berg Decl. Ex. 1, at 40; Ex. 29, at 1 (Plaintiff stating in a letter to CEO Chuck Mattera that Defendants "assigned an obviously unqualified, poorly educated Caucasian woman to supervise the new person"). Plaintiff also had a tense relationship with her "Clean Room Lead," Liza Dayton, who Plaintiff describes as "rude and disrespectful toward Plaintiff but not to [her] male colleagues." Pl.'s Compl. ¶ 21. Lead Dayton avers that Plaintiff often became "very argumentative" and would insult Dayton when Plaintiff was assigned to a disfavored task. [1] Berg Decl. Ex. 24, at 2–3 ("Every time there's a job that she doesn't like, she will start saying that she's being harassed and she's being attacked.").

---

[1] *See* Berg Decl. Ex. 24, at 3 ("Q. What did [Plaintiff] say to you that you found insulting? A. She called me stupid. She would insult me by calling me stupid many times. She would tell me that I'm uneducated. And she would keep going that she was – you know, she went to a very prestigious school in China, that she supervised 500 students in China and that she would teach the teachers in China. And I was nothing compared to her, and she would go on and on about that.").

In November of 2016, Defendants formally disciplined Plaintiff for slapping Lead Dayton in the buttocks several times in front of their coworkers. Berg Decl. Ex. 1, at 78. Rather than terminating Plaintiff for sexual harassment, Defendants reviewed the company code of conduct with Plaintiff, issued a "Performance Assessment & Improvement Plan," and warned Plaintiff that any further misconduct would result in "further disciplinary action, up to and including termination." *Id*. Plaintiff contends that the company "knew or should have known that Plaintiff and others engaged in horseplay in the workplace," that her supervisors unfairly targeted Plaintiff,[2] and that "Defendants' disciplinary action chilled Plaintiff's complaints for a couple months." Pl.'s Compl. ¶ 21.

Around this same time, Plaintiff reported that she was having difficulty with her eyes and requested a magnifying glass to help her label products. Berg Decl. Ex. 1, at 68. Defendants provided this accommodation immediately. *Id*. ("They gave you a magnifying glass when you requested one without delay, correct? A. Correct."). Then in April of 2017, Plaintiff submitted a doctor's note stating that Plaintiff suffers from "cataract and dry eye" and that she would need "frequent breaks from looking through the microscope and should be excused from looking through the scope for continuous periods greater than 30 minutes." Lafky Decl. Ex. 5, at 1, ECF No. 80. Defendants accommodated this request and adjusted Plaintiff's break schedule accordingly.[3] Berg Decl. Ex. 1, at 69.

---

[2] Plaintiff alleges that on a previous occasion, Lead Dayton choked Plaintiff and slapped her in the buttocks. Pl.'s Compl. ¶ 21. Plaintiff has not provided any evidence to substantiate this claim.

[3] *See* Berg Decl. Ex. 1, at 69 ("And it's true, is it not, that Finisar promptly made an accommodation consistent with the recommendation of your written doctor's note? A. Yes. Q. Do you contend that Finisar/LightSmyth failed to in some way accommodate your alleged eye disability in this time frame? A. No.").

Over the next year, tensions further escalated between Plaintiff, Supervisor Brown, and Lead Dayton. On February 25, 2018, Plaintiff made a formal complaint to General Manager Gil Cohen, detailing what she perceived as "prima facie examples of abuse of power, retaliation, and discrimination." Lafky Decl. Ex. 20, at 2. The essence of Plaintiff's grievance involved her disagreements with Lead Dayton about her product packaging duties. *Id.* Plaintiff also alleged that Brown and Dayton conspired to "make her life as difficult as possible at Lightsmyth." *Id.* In this letter, Plaintiff requested a new supervisor "who is reasonable, and appreciates my contributions." *Id.* In response to Plaintiff's complaint, Neel Dhar, Finisar's Sr. HR Manager, flew up to Eugene from San Jose, California to interview Plaintiff, Dayton, Brown, and several other employees. Defs.' Mot. 12; Berg Decl. Ex. 37, at 1. On March 27, 2023, Ms. Dhar notified Plaintiff that based on the inconsistencies in Plaintiff's interview, Ms. Dhar was "unable to substantiate" Plaintiff's claims. *Id.*; Berg Decl. Ex. 27, at 6.

### *March–April 2018 Restructuring of Plaintiff's Job Duties*

On March 15, 2018, Plaintiff requested further accommodation for her vision, and submitted a doctor's note indicating that she was "not able to perform visual inspection of subtle surface defects." Lafky Decl. Ex. 5, at 2. Since, according to Defendants, visual inspection was an essential function of Plaintiff duties, Defendants decided to restructure her role. Berg Decl. Ex. 39, at 1. On March 26, 2018, Plaintiff's official title changed from "Supply Chain Manager" to "Manufacturing Technician," which also changed her status from an overtime-exempt, salaried employee to a non-exempt, hourly employee. *Id.* Plaintiff's primary duties included "packaging all out going shipments," "optical efficiency of standard material supply and customer gratings," and "loading and unloading the parts washer." *Id.* Supervisor Brown advised Plaintiff,

> We will restructure your role as described above as an accommodation to you, and will "try out" the restructured position for a period of one month. After that time, Neel [Dhar] and I will meet with you again to discuss how this accommodation is working, whether Finisar can continue to offer you this accommodation, and whether there may be some other available accommodation that Finisar can offer to you.

*Id*. Defendants also promised to work with IT to adjust the font size of the OE station monitor and to provide Plaintiff with special safety glasses equipped with magnifying lenses. *Id*. at 2. After 30 days, the accommodation seemed to be working, and Plaintiff's new role was made permanent on April 26, 2018. Pl.'s Resp. 8, ECF No. 79.

### May 2018 Annual Performance Review

On May 8, 2018, Plaintiff received her annual performance evaluation from Supervisor Brown. Berg Decl. Ex. 40, at 1–3. The report indicated that Plaintiff "met expectations" in every category and "exceeded expectations" in the "commitment to quality" category. *Id*. at 1–2. In the "goals and objectives" section, Supervisor Brown opined that Plaintiff could work on "packaging single pieces in 5 minutes or less[,]" and should "[c]ontinue to work on clear communication with lead and manager." *Id.* at 2. Plaintiff avers that the suggestion to increase her productivity was "one of the most offensive and hostile occurrences that happened" during her employment. Berg Decl. Ex. 1, at 98; Defs.' Mot. 14.

### October 2018 Admonition About Respecting Coworkers

On October 2, 2018, after another employee notified management that several "Accelink wafers" showed signs of dripping and "significant walk off," Lead Dayton suggested in an email that Plaintiff might be responsible for the wafer walk off. Berg. Decl. Ex. 17, at 3–4. (Dayton stating, "I didn't change the set up that Hui's been working this morning I wonder if this is the problem that she is having of significant walk off."). Plaintiff was deeply offended by Lead Dayton's statement, and in a follow-up email to Supervisor Brown, Plaintiff accused Dayton of

5 – OPINION AND ORDER

lying, attacking her, and damaging Plaintiff's reputation. *Id*. at 1. On October 15, 2018, after Supervisor Brown received reports that Plaintiff told several coworkers that "Liza [Dayton] lied in the email," Brown set up a meeting with Plaintiff to discuss Finisar's policy against spreading rumors and disrespecting coworkers. Berg Decl. Ex. 43. Plaintiff describes this meeting as "hostile and offensive" and alleges that Brown treated her "inhumanly" (1) based on Brown's "tone and mannerisms" by (2) "deny[ing] all of the facts" and (3) by prohibiting Plaintiff from discussing the email with anyone else. Berg Decl. Ex. 1, at 605–607.  Plaintiff also avers that Brown used her "maximum power to protect the defamation [of Plaintiff]." *Id*. at 607.

### *November 2018 Offer of Severance*

On November 1, 2018, Plaintiff provided Defendants with a third doctor's note and accommodation request. Lafky Decl. Ex. 8, at 9. In the note, Dr. Jane Mossberg, M.D.,[4] stated that she treats Plaintiff for hypertension, depression, anxiety, and shingles, and that these conditions were "severely exacerbated by the work harassment [Plaintiff] has been having to tolerate." *Id*. Dr. Mossberg opined that Plaintiff's position should be changed to "avoid certain harassing co-workers and managers." *Id*. Defendants denied this request. On November 11, 2018, Plaintiff made another formal complaint to Neel Dhar and again requested a new supervisor. Pl.'s Resp. 8. Ms. Dhar then called Plaintiff and explained that she had already looked into the allegations of harassment, that Finisar had made every reasonable accommodation for Plaintiff's eyes, and that they would not issue Plaintiff a new supervisor. Berg Decl. Ex. 27, at 8. Ms. Dhar also suggested that if Plaintiff was unhappy working for the company, then they could offer Plaintiff a severance package, and that the decision was up to her. *Id*. at 8–10 ("Q. What was her response to that? A. Like I said to her, I don't want an answer

---

[4] Jane Mossberg is the ex-wife of Tom Mossberg, former Lightsmyth CEO, and Plaintiff's close friend. Lafky Decl. Ex. 24, at 1.

from you, think about it. She was thankful. She said, okay, I will think about it and let you know. Q. Was there ever a specific severance package offered? A. No, we just talked about it.").

In an email to Ms. Dhar two days later, Plaintiff stated, "I am very sad that Finisar has decided to offer me a package to force me out of the employment with the company." Lafky Ex. 8, at 8. Plaintiff also accused Ms. Dhar of stating that Plaintiff's harassment-related health conditions were Plaintiff's problem, rather than the company's.[5] *Id.* In response, Ms. Dhar reminded Plaintiff that the decision to leave was completely up to her. She also suggested that Plaintiff could take a leave of absence for her health as another option.[6] Berg Decl. Ex. 45, at 1.

### *Plaintiff and Defendants Part Ways*

On February 4, 2019, Plaintiff requested paid time off to take care of her terminally ill sister and Defendants immediately granted this request. Berg Decl. Ex. 1, at 42–45. After Plaintiff maximized her PTO days, she notified Defendants that her "situation [was] not changing" requested six months of unpaid leave. Berg Decl. Ex. 47, 49. HR specialist Jessica Pastor informed Plaintiff that caring for her sister was not a qualifying event under the Family Medical Leave Act ("FMLA"), however, Finisar would provide Plaintiff with an additional 30 days of unpaid leave. Berg Decl. Ex. 49; Ex. 51, at 1. Ms. Pastor also explained that 30 days was the maximum number of days allowed under the company policy[7] and that if Plaintiff did not

---

[5] Ms. Dhar has consistently denied making this statement. Berg Decl. Ex. 27, at 10; Berg Decl. Ex. 45.

[6] In her response to Plaintiff, Ms. Dhar stated that the "Company wanted to give you the option to leave and seek employment elsewhere, while providing you with some financial security as you sought a new opportunity. We have no desire to push you out; indeed, as I mentioned in my last email, Catherine thinks you are doing good work in your role as a Technician. The decision to accept or reject that package was entirely up to you, and now that you have declined the severance package, we will not discuss it further." Berg Decl. Ex. 45, at 1.

[7] Finisar's 'personal leave of absence' policy states:

> Under special circumstances, employees with at least one year of employment may be granted a leave of absence without pay when the employee has no other leave available to

return to work on March 25, 2019, "we will be unable to hold your job and will assume that you have voluntarily resigned from your position." *Id*. Plaintiff accepted the proposal, and on March 24, 2019, Plaintiff informed Ms. Pastor that she would not be returning to work and that she had cleared out her locker. Berg Decl. Ex. 48, at 1.

The following month, Plaintiff filed a complaint with the Bureau of Labor and Industries (BOLI) alleging that she was subject to (1) discrimination based on her race, national origin and disability, (2) retaliation, (3) workplace harassment (4) wrongful termination, and (5) that Defendants failed to accommodate her disability. Berg Decl. Ex. 52. On April 23, 2020, BOLI dismissed Plaintiff's complaint for "lack of substantial evidence linking the alleged harm to [Plaintiff's] membership in a protected class." Berg Decl. Ex. 54, at 2.  On July 23, 2020, Plaintiff filed the present lawsuit, alleging identical claims. *See generally* Pl.'s Compl. Defendant moves for summary judgment on all claims.

## STANDARD

"Federal Rule of Civil Procedure 56(a) expressly permits a party to move for summary judgment on a claim or defense." *E.E.O.C. v. Fred Meyer Stores Inc.*, 954 F. Supp. 2d 1104, 1112 (D. Or. 2013) (internal quotations and emphasis in original omitted). This Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could find in favor of the non-moving party. *Rivera v.*

---

them. The granting of this type of leave is normally for compelling reasons and requires the manager's approval, which may be granted or withheld for any reason. *Leaves may not exceed one month . . .*

Berg Decl. Ex. 50, at 21 (emphasis added).

*Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.*

The Court reviews evidence and draws inferences in the light most favorable to the nonmoving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the nonmoving party must present "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient" to avoid summary judgment. *Liberty Lobby, Inc.*, 477 U.S. at 252. Uncorroborated allegations and "self-serving testimony" are also insufficient. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).

## DISCUSSION

### I.    Majority of Claims are Time-barred.

Defendants move for summary judgment on all claims occurring prior to April 25, 2018. Defs.' Mot. 18. Under Oregon law, civil actions alleging wrongful employment practices must be commenced within one year after the occurrence of the unlawful incident "unless a complaint has been timely filed under ORS 659.820."[8] Or. Rev. Stat. § 659A.875(1)(a). For Plaintiff's federal claims, the filing window is even narrower. Claims brought under Title VII and the Americans with Disabilities Act (ADA) require plaintiffs to file a complaint with the Equal

---

[8] Although claims brought under ORS § 659A.030 are now subject to a five-year statute of limitations, the new statutory period only applies to incidents occurring on or before September 29, 2019. *See* Oregon Workplace Fairness Act, S.B. 726, § 6(b), 80th Leg., Reg. Sess. (Or. 2019). Because all of Plaintiff's allegations of unlawful employment practices occurred before September 29, 2019, the one-year statute of limitations applies. *See Thompson v. Inman*, No. 6:21-CV-01231-MK, 2022 WL 17658245 at *4, n.4 (D. Or. Sept. 30, 2022), *report and recommendation adopted*, No. 6:21-CV-01231-MK, 2022 WL 17979740 (D. Or. Dec. 28, 2022).

Employment Opportunity Commission (EEOC) within 300 days of the alleged unlawful act. 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d). The "filing date" is the date that a plaintiff files a civil action or files a complaint with an administrative agency. OAR 839-003-0025(5). Since Plaintiff filed her BOLI complaint on April 25, 2019, all incidents of discrimination and retaliation occurring prior to April 25, 2018, are time-barred.[9]

## II.    Remaining Claims of Disparate Treatment

Plaintiff brings four timely claims alleging race, national origin and gender discrimination under ORS § 659A.030 and 42 U.S.C. § 2000e-2, [10] and retaliation under ORS § 659A.030(1)(f) and ORS § 659A.199 (Whistleblower).

Discrimination claims are subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973).   First, Plaintiff must establish a *prima facie* case of discrimination by showing: 1) she belongs to a protected class; 2) she was qualified for the position; 3) she was subject to an adverse employment action; and 4) similarly situated individuals outside of her protected class were treated more favorably. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). Next, the burden shifts to the employer to articulate a

---

[9] Plaintiff concedes that "evidence of retaliation and discrimination endured by Plaintiff prior to April 25, 2018 may not be directly actionable[.]" Pl.'s Resp. 14. However, Plaintiff argues that the Court may consider all of Plaintiff's allegations of discrimination and retaliation based on the continuing violations doctrine. *Id.* at 13. The Court disagrees. Timely discrimination and retaliation claims must be based on independent and discrete occurrences of adverse action. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112–113 (2002). In contrast, the doctrine of continuing violations is applicable "where there is no single incident that can fairly or realistically be identified as the cause of significant harm," such as in a hostile work environment claim. *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002). *See Morgan*, 536 U.S. at 117 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.").

[10] Plaintiff's federal and state claims under Title VII and ORS § 659.030 have the same legal standard of review. *DeWeese v. Cascade Gen. Shipyard*, No. 08-cv-860-JE, 2011 WL 3298421, at *7 (D. Or. May 2, 2011).

legitimate, nondiscriminatory reason for the alleged disparate treatment. *Id.* at 1091.  Finally, the employee must offer evidence that the employer's proffered legitimate, nondiscriminatory reason for the alleged disparate treatment is a pretext for discrimination. *Id.*

In the discrimination context, an adverse action is one that "materially affect[s] the compensation, terms, conditions, or privileges of [employment]." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1126 (9th Cir. 2000). The Supreme Court described such an action as a "tangible employment action." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 760 (1998). Not every reassignment or even demotion suffices. *Id.* Instead, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 761.

Claims for retaliation are subject to the same *McDonnell Douglas* burden-shifting analysis as discrimination claims. To establish a *prima facie* claim for retaliation, an employee must establish 1) her involvement in protected activity, 2) an adverse employment action, and 3) a causal link between the two. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2001). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 970  Finally, the employee must offer evidence that the employer's proffered legitimate, nondiscriminatory reason for the alleged adverse employment action is a pretext for retaliation. *Id.*

In contrast to the standard for discrimination claims noted above, an adverse employment action in the context of a retaliation claim is "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000). In establishing a causal

link between the protected activity and adverse employment action, an employee must prove the employer's "desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). Absent direct evidence of retaliatory intent, causation may be inferred solely from timing when the "adverse employment action follows on the heels of protected activity." *Villiarimo*, 281 F.3d at 1065.

### A. March 26, 2018 Restructuring of Plaintiff's Duties

Plaintiff characterizes the decision to change her role from Supply Chain Manager to Manufacturing Technician as a retaliatory adverse action. Pl.'s Resp. 19. As an initial matter, the parties dispute whether this act falls within the one-year statute of limitations. Defendants argue that the relevant date is March 26, 2018, when HR notified Plaintiff of her new role and commenced the 30-day trial. Defs.' Mot. 19. Plaintiff contends that Defendants' retaliatory action occurred on April 26, 2018, when the trial period expired and her role was made permanent. Pl.'s Resp. 16. Assuming, without deciding, that this act occurred within the statutory period, Plaintiff's claim still fails because a reasonable jury could not find that the change in her role was a retaliatory adverse action.

Plaintiff's prima facie claim is weak at best. There is no doubt that Plaintiff engaged in protected activity on February 25, 2018, when she emailed Gil Cohen regarding Lead Dayton and Supervisor Brown's alleged "abuse of power, retaliation, and discrimination." Lafky Decl. Ex. 20, at 2.  In response to Plaintiff's complaints, Neel Dhar conducted an internal investigation and concluded on March 27, 2018, that Plaintiff's allegations were unfounded. The day before Ms. Dhar shared her findings, Defendants restructured Plaintiff's job, which Plaintiff describes as a "demotion." Plaintiff interprets these facts as showing a causal connection between Plaintiff's complaint to HR and her role restructuring. Pl.'s Resp. 19

However, the facts indisputably show that on March 15, 2018, while the investigation was ongoing, Plaintiff made a separate accommodation request, this time seeking exemption from "performing visual inspections of subtle surface defects," which was an essential function of her job. Lafky Decl. Ex. 5, at 2; Berg Decl. Ex. 39. Defendants simply complied with Plaintiff's request and restructured her duties accordingly. Plaintiff contends that Defendants' accommodation was an adverse action because (1) her new role was less prestigious, (2) she had to switch from a cubicle to a locker (to make room for her replacement), and (3) her status changed from an overtime-exempt salaried employee to a non-exempt hourly employee. Xu Decl. ¶ 13, ECF No. 81; Berg Decl. Ex. 39.

Although Plaintiff's title and exemption status changed, Plaintiff offers no evidence that that her pay and benefits significantly decreased or that her duties significantly changed. *See Ellerth*, 524 U.S. at 761 (describing adverse action as "reassignment with *significantly different* responsibilities, or a decision causing a *significant change in benefits*.") (emphasis added); *Maclin v. SBC Ameritech*, 520 F.3d 781, 789 (7th Cir. 2008) (finding no adverse action where title changes "but position remains the same in terms of responsibilities, salary, benefits and opportunities for promotion"). In fact, by exempting Plaintiff from performing visual inspections, Defendants merely limited her role to duties that she had already been performing under her previous role. *See* Berg Decl. Ex. 37 (Plaintiff stating on February 25, 2018, "for over a year, I have mainly been assigned to do packaging and clean dishes in the parts washer"). But even if restructuring Plaintiff's role was considered adverse, Plaintiff fails to meet the third element: a causal connection between the change in her title and her protected activity. To succeed on a retaliation claim, Plaintiff would need to show that *but for* her filing of the complaint, Defendants would not have changed her title and status. *Nassar*, 570 U.S. at 352

(emphasis added). Here, Defendants would have restructured Plaintiff's role to accommodate her alleged disability, regardless of whether she engaged in previous protected activity.

Plaintiff fails to meet the elements of a prima facie case of retaliation; and even if she could, Defendant's met their burden of providing a reasonable and nondiscriminatory explanation for their actions. *Little*, 301 F.3d at 970. Plaintiff overs no evidence, other than her self-serving speculation,[11] that Defendant's accommodation was a pretext for retaliation. *Id; See Villiarimo*, 281 F.3d at 106 ("Uncorroborated allegations and self-serving testimony are [] insufficient" to avoid summary judgment).

### B.  May 8, 2018 Annual Performance Review

Plaintiff also characterizes her May 8, 2018, performance review as evidence of discrimination and retaliation. Pl.'s Resp. 19. Plaintiff contends that the review was "significantly more negative" – in terms of scores, language, and tone – than her previous reviews. *Id*. at 18. The record does not support this argument. Plaintiff's 2017 and 2018 reviews contain almost identical ratings; both indicate that Plaintiff either "met expectations" or "exceeded expectations" in every category, and that Plaintiff's "overall performance" met expectations. Berg Decl., Ex. 40; Ex. 57. The 2018 review offers several positive comments; for instance, Plaintiff "has a strong desire to do well, likes to be helpful[,] [i]s opening [sic] to learning," and "keeps her area clean and clutterfree [sic]." Berg Decl. Ex. 40, at 1–2.

Although the review states that Plaintiff should work on her packaging efficiency and should continue to communication with her supervisors, this hardly qualifies as a "negative review." *Id*. Nor was the suggestion unfounded. Only a few weeks before, Plaintiff met with Supervisor Brown and Vice President Dmitri Iazikov to discuss Plaintiff's difficulty with

---

[11] See Berg Decl. Ex. 1, at 111 (Plaintiff calling Defendant's accommodation a "coverup").

meeting her production quotas. Berg Decl. Ex. 1, at 98. An *undeserved* performance review may constitute a cognizable adverse employment action. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (emphasis added). However, "[a] low performance evaluation which does not affect the employee's work does not amount to an adverse employment action." *Hess v. Multnomah Cnty.*, 216 F. Supp. 2d 1140, 1154 (D. Or. 2001) (citing *Kortan v. Cal. Youth Auth.,* 217 F.3d 1104, 1112–13 (9th Cir. 2000)).  Plaintiff's performance review was neither undeserved, nor significantly more negative than her previous reviews.[12]

In any event, Plaintiff fails to show how the review is causally connected to her protected class or her protected activity.[13] A plaintiff's "failure to allege specific facts sufficient to establish the existence of a prima facie case renders a grant of summary judgment appropriate." *Yartzoff*, 809 F.2d at 1374; *See* Fed. R. Civ. P. 56(e). For these reasons, Plaintiff's discrimination and retaliation claim fails.

### C.  October 15, 2018, Admonition about Respecting Coworkers

Plaintiff additionally fails to support a discrimination claim based on her October 15, 2018, meeting with Supervisor Brown. Brown's reminder to respect Plaintiff's coworkers and to refrain from spreading rumors was neither an adverse action, nor linked to Plaintiff's protected class. Berg Decl. Ex. 43; Defs.' Mot. 23. Although Plaintiff contends that she was treated "inhumanely" because Brown "denied all the facts," the evidence does not show that Plaintiff was harshly criticized or even formally reprimanded. Berg Decl. Ex. 1, at 605–607. An adverse action requires some tangible employment action "such as hiring, firing, failing to promote,

---

[12] In fact, Plaintiff's 2016 Performance Assessment and Improvement Plan, which was issued following Plaintiff's spanking incident, is the most negative review in the record.  *See* Berg Decl. Ex. 34.

[13] For example, Plaintiff provides no evidence that her non-female Caucasian coworkers received significantly higher reviews than she did.

reassignment . . . [or a] change in benefits." *Ellerth*, 524 U.S. at 761. Mere criticism of an

employees' conduct, even when unjustified, does not "rise to the level of adverse employment

action." *Kraus v. Presidio Tr. Facilities Div./Residential Mgmt. Branch*, 704 F. Supp. 2d 859,

865 (N.D. Cal. 2010).

### D.  November 18, 2018 Offer of Severance

Finally, Defendant's severance offer does not constitute an act of discrimination or

retaliation. After Plaintiff's fourth accommodation request, Ms. Dhar informed Plaintiff that a

new supervisor was not a reasonable accommodation and that HR had already thoroughly

investigated Plaintiff's complaints of harassment. Berg Decl. Ex. 27, at 8. Ms. Dhar then *offered*

Plaintiff the choice of either remaining in her position, accepting a severance package, or taking

a brief leave of absence to take care of her mental health. *Id*. at 8–10; Berg Decl. Ex. 45, at 1.

Plaintiff had complete autonomy in how she wished to proceed and ultimately declined to accept

the package. An "offer of a severance agreement does not itself raise an inference of pretext."

*Miller v. United Parcel Serv., Inc.*, 196 F. App'x 489, 490 (9th Cir. 2006); *E.E.O.C. v. Nucletron*

*Corp.*, 563 F. Supp. 2d 592, 598–99 (D. Md. 2008) ("The mere offer of a severance agreement,"

without additional consideration, "is not adverse and therefore is not discriminatory. *Id*.

Plaintiff attempts to find evidence of unlawful motive where there is none. She claims,

without providing any evidence, that Ms. Dhar told Plaintiff that her health conditions were

Plaintiff's problem, rather than the company's problem. Lafky Decl. Ex. 8, at 8. Even so, the

health conditions that Plaintiff alleges here – anxiety, depression, and hypertension – are not

qualifying disabilities that Defendants were required to accommodate.  *See* Section V, *infra*;

Berg Decl. Ex. 1, at 95 (Plaintiff admitting that her lazy eye was her only alleged disability).

Plaintiff also points to a December 17, 2018 email where HR Director Sheila Roberts calls

Plaintiff by the wrong name[14] and suggests that Defendants "may be able to fight" Plaintiff's repeated requests for a new supervisor. *See* Lafkey Decl. Ex. 24, at 2. First, this email was sent *one month after* Ms. Dahl's conversation with Plaintiff, which negates any causal connection to the severance offer. Second, calling Plaintiff by another generically Asian name on a *single occasion*, does not rise to the level of disparate treatment. Third, Defendants were well within their rights to "try to fight" Plaintiff's request. Under the EEOC guidelines, a request for a new supervisor is *per se* unreasonable. *Roberts v. Permanente Med. Grp., Inc.*, 690 F. App'x 535, 536 (9th Cir. 2017) (*Memorandum Disposition*). In sum, Plaintiff provides no evidence that the offer of severance was made with retaliatory intent or was based on her protected status as an Asian woman.

Because no reasonable jury could find that Plaintiff suffered any adverse employment actions, the Court grants summary judgment on Plaintiff's discrimination claims (I and VI) and retaliation claims (I, II, and IV). [15]

### III.    Hostile Work Environment

Plaintiff also brings a hostile work environment claim under ORS § 659.030 and 42 U.S.C. § 2000e-2 (a). To prevail on a hostile work environment claim, Plaintiff "must show: (1) that she was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the

---

[14] Instead of calling Plaintiff "Hui," Roberts called Plaintiff "Wei," which, according to Plaintiff, is "the most common Chinese name." Lafkey Decl. Ex. 24, at 2.

[15] Plaintiff also brings (1) a wage retaliation claim under ORS § 653.060(1)(a), alleging that "Defendants constructively discharged and discriminated against Plaintiff because she inquired about and reported violations of overtime laws," and (2) an ADEA claim under 29 U.S.C. § 623 alleging age discrimination. Pl.'s Compl. ¶¶ 59, 61. However, the parties do not address either of these claims in their briefings and the Court is not aware of any evidence in the record concerning reports of a wage violation or discriminatory treatment based on Plaintiff's age. It is not the Court's responsibility to "manufacture arguments" on behalf of Plaintiff or to consider claims that were not actually argued by the parties. *Indep. Towers of Wa. v. Wa.*, 350 F.3d 925, 929 (9th Cir. 2003). "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991). The Court grants summary judgment on Plaintiff's Eighth and Eleventh Claims.

conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive environment." *Vasquez v. Cnty of L.A.*, 349 F.3d 634, 642 (9th Cir. 2003). To determine whether conduct was sufficiently severe or pervasive, courts consider the totality of the circumstances, "including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)). "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)' are not sufficient to create an actionable claim under Title VII, but the harassment need not be so severe as to cause diagnosed psychological injury." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 687 (9th Cir. 2017) (alteration in original) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Plaintiff alleges the following incidents of "harassment" based on her gender and race: (1) She was the only female working in the cleaning room other than Lead Dayton (who is also an Asian woman) (2)  Lead Dayton called Plaintiff and another female employee a "bitch" at a retirement party (3) Lead Dayton frequently complained to Supervisor Brown about Plaintiff's "high pitched" voice (4) Lead Dayton asked Plaintiff, but not her white male colleagues, to package with remnants[16] (5) Lead Dayton enforced break policies with Plaintiff but not her male co-workers (6) Lead Dayton "ridiculed"[17] Plaintiff because of her failing eyes (7) and Sheila

---

[16] Plaintiff claims that "remnants packaging was considerably more difficult and slowed [her] performance significantly. Xu Decl. ¶ 30.

[17] Apparently Lead Dayton told Plaintiff's coworkers that Plaintiff "has difficulty putting labels on," which made Plaintiff feel "insulted, humiliated, embarrassed and angered." Pl.'s Compl. ¶ 19; Berg Decl. Ex. 1, at 87–88.

Roberts referred to Plaintiff by the wrong name in an email. Pl.'s Resp. 12, 20, 23-24, 26; Lafky Decl. Ex. 6, at 1; Ex. 12, at 3, Ex. 23, at 4–5.

Defendants argue that none of Plaintiff's "hostile" interactions with her coworkers occurred *because of* her protected status as an Asian woman. Defs.' Mot. 27. Indeed, Plaintiff and Lead Dayton's acrimonious relationship seems far more attributable to a personality conflict rather than Plaintiff's protected class. In any event, none of these incidents were so 'severe or pervasive' as to alter the conditions of Plaintiff's employment. *Vasquez*, 349 F.3d at 642. The Ninth Circuit has set a high bar for conduct that constitutes "severe or pervasive." *See Kortan*, 217 F.3d at 1106–07 (*Denying* hostile work environment claim where supervisor stated female employee "laughs like a hyena," called female employees "regina," "madonna," "castrating bitches" and called plaintiff "Medea."); *Sanchez v. City of Santa Ana*, 936 F.2d 1027, 1031 (9th Cir. 1990) (No hostile work environment where police department displayed racially offensive cartoon, made racially offensive slurs, and provided Latino employees with unsafe vehicles and inadequate police backup.). Being teased for vision problems, a high-pitched voice, or being called a "bitch," does not come close the level of harassment displayed in *Kortan* or *Sanchez*.[18]

In sum, Defendants' conduct "did not so pollute the workplace that it altered the conditions of [Plaintiff's] employment. *Manatt v. Bank of Am.*, N.A., 339 F.3d 792, 798 (9th Cir.

---

[18] Plaintiff contends that Defendant's conduct need not be as severe as the conduct displayed in *Kortan* because Plaintiff suffered harassment over a continuous period from 2014 until 2019. Pl.'s Resp. 25 (citing *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991) ("the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct.")). Although *Ellison* supports the proposition that one or two egregious incidents of harassment may be sufficient to show a hostile environment, it does not follow that a few offhand comments and incidents of mild bullying over the span of several years also supports a hostile environment. *Ellison*, 924 F.2d at 878. Moreover, the evidence does not show that Plaintiff's "harassment" was continuous; she only provides factual allegations of a few isolated incidents, none of which are sufficiently severe or pervasive. *See Vasquez*, 349 F.3d at 642 (denying hostile work environment where Plaintiff claimed Defendant "*continually* harassed him but provide[d] specific factual allegations regarding only a few incidents") (emphasis added).

2003). Plaintiff appears to have been a difficult employee who struggled to maintain amiable

relationships with her coworkers. Although Plaintiff believes that she was treated unfairly, Title

VII was not enacted as a "general civility code" or meant to provide relief from "the ordinary

tribulations of the workplace." *Faragher*, 524 U.S. at 788. Plaintiff's hostile work environment

claims (I and VI) fail.

### IV.    Wrongful Discharge

Plaintiff also brings a claim for retaliatory discharge under ORS § 659A.030, and 42

U.S.C. § 2000e-2.[19] Although Plaintiff seems confused[20] as to whether she voluntarily resigned

or was terminated, she asserts her claim under a theory of constructive discharge. Defendants

argue that Plaintiff never actually resigned; instead, she was terminated when she failed to return

to work. Defs.' Reply 10, ECF No. 76. The facts undisputedly show that Plaintiff requested

unpaid leave to care for her sister, and that Defendants warned Plaintiff that if she did not return

to work on March 25, 2019, "we will be unable to hold your job and will assume that you have

*voluntarily resigned* from your position." Berg Decl. Ex. 51, at 1 (emphasis added). On March

24, 2019, Plaintiff wrote an email to Defendants stating, "I am disappointed that you will not

grant me any more leave. At this time *I'm not able to return to work* until my difficult situation is

resolved." Berg Decl. Ex. 48, at 1 (emphasis added). Defendants then sent Plaintiff a letter

---

[19] Plaintiff also brings a claim for common law wrongful discharge (Claim V). However, the Ninth Circuit has "held that Title VII and ORS § 659A.030 provide adequate statutory remedies such that a common law wrongful-discharge claim based on retaliation is not available." *Lindsey v. Clatskanie People's Util. Dist.,* 140 F. Supp. 3d 1077, 1095 (D. Or. 2015).

[20] In her briefing Plaintiff states that she "requested leave and was constructively discharged by Defendants when she did not return from leave when told to." Pl.'s Resp. 9. However, Plaintiff also states that she "went on leave approximately six weeks later and was subsequently *terminated*." *Id.* at 15 (emphasis added); Berg Supp. Decl. Ex. 1, at 3 ("Q: Who decided your *termination*? A: I am not clear whether it was one person or multiple persons.") (emphasis added).

stating the following: "This letter serves as confirmation that your employment with Finisar has been *terminated*." Berg Supp. Decl. Ex. 2, ECF No. 89 (emphasis added). Although the evidence tends to point towards termination, the distinction is immaterial; Plaintiff cannot prove a wrongful discharge claim under either theory.

### A.  Constructive Discharge

Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004)). This is a high bar. *Id.* As described by the Ninth Circuit:

> [A] constructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.

*Id.* (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000). The standard for a constructive discharge is *even higher* than the "severe and pervasive" standard in a hostile work environment claim. "This aggravated claim arises when plaintiff presents a worst case harassment scenario, harassment ratcheted up to the breaking point". *Suders*, 542 U.S. at 147–148 (internal quotations omitted). Because Plaintiff has not shown that the harassment she endured even meets the "severe and pervasive" standard for a hostile work environment claim, her constructive discharge claim necessarily fails.

### B.  Wrongful Termination

As an alternative to her constructive discharge theory, Plaintiff also contends that she was terminated because "she attempted to enforce her right to be free from discriminatory conduct

and hostility due to her race, age disability, national origin, and whistleblowing activity." Pl.'s Compl. ¶ 54. However, Plaintiff provides no evidence of an unlawful motive. The evidence indisputably shows that Plaintiff 's employment ended because she refused to return to work, after maximizing her 30-day leave. Plaintiff provides no evidence that her termination was discriminatory or that Defendants inconsistently applied company policy. Berg Decl. Ex. 1, at 56–58 ("Q. The decision not to extend you more than 30 days of personal leave was consistent with the company policy; correct? A. Correct. . . Q. Do you know of any employee who has received more than 30 days of personal leave?  . . . A. I do not know.") Defendants show a legitimate, lawful reason for ending Plaintiff's employment and Plaintiff offers no evidence of pretext. For these reasons, Plaintiff's wrongful discharge claims (I, II, V, VI) fail.

## V.    Disability Claims

Finally, Plaintiff brings claims under the Americans with Disabilities Act, 42 U.S.C. § 12112, and ORS § 659A.112(1), alleging theories of (1) discrimination on the basis of disability and (2) failure to accommodate. Pl.'s Compl. ¶¶ 48–51, 57–58. Plaintiffs have 300 days after an alleged discriminatory action to file a charge under the ADA and one year to file a charge under Oregon law. 42 U.S.C. § 2000e-5(e)(1); Or. Rev. Stat. § 659A.875(1)(a). Therefore, all alleged incidents occurring before April 25, 2018 are time-barred.

### A.  Discrimination on the Basis of Disability

To establish a prima facie case of disparate treatment based on disability, Plaintiff must establish (1) that she is a disabled person within the meaning of the ADA, (2) that she is qualified with or without reasonable accommodation to perform the essential functions of the job, and (3) that she suffered an adverse employment action because of her disability. *See Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996). The ADA defines disability as a

physical or mental impairment that substantially limits a person's *major life activities*,[21] has a record of such an impairment, or is regarded as having such an impairment. 42 U.S.C. § 12102(1) (emphasis added).

Plaintiff contends that her eye condition qualifies as a disability under the ADA and that she was discriminated against because of this condition.[22] Pl.'s Resp. at 26. While Plaintiff's lazy eye may have impacted her ability to conduct finely detailed visual inspections, Plaintiff provides no evidence that her lazy eye impacts her ability to perform activities of daily living, such as seeing, reading, or concentrating. 42 U.S.C. § 12102(2)(A); *See* Berg. Decl. Ex. 1, at 15 (Plaintiff admits that her condition "did not impact in any way on [her] daily life."). Therefore, Plaintiff is not disabled under the meaning of the ADA.

Even if Plaintiff's lazy eye did qualify as a disability, she did not suffer any adverse employment actions because of her lazy eye. As previously stated, (1) the restructuring of Plaintiff's job duties – to *accommodate* her alleged condition, (2) her 2019 annual performance review, and (3) Defendants' offer of a severance package do not constitute adverse employment actions. Plaintiff fails to support a prima facie claim of discrimination based on a disability.

### B. Failure to Accommodate

"The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a qualified individual, the employer receives adequate notice,

---

[21] Major life activities are defined as, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i)(1) (2012).

[22] *See* Berg. Decl. Ex. 1, at 63 ("Q. What is the disability -- your disability for which you allege you were discriminated by defendant? A . . . Well, it's because of my eyes, my eyesight. I only have one good eye. The other eye is what's called lazy eye. Q. Are there any other disabilities for which you allege defendants discriminated against you? A. No.")

and a reasonable accommodation is available that would not place an undue hardship on the operation of the employer's business." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) (citing 42 U.S.C. § 12112(b)(5)(A)) (internal quotations omitted). "[A]n employer has a mandatory obligation 'to engage in an interactive process with employees in order to identify and implement appropriate reasonable accommodations." *Anthony v. Trax Int'l Corp.*, 955 F.3d 1123, 1134 (9th Cir. 2020). While an employer is not required to provide a *particular* accommodation requested by an employee, it still must offer a reasonable accommodation. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002). Reasonable accommodation includes "job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B).

Regardless of whether Plaintiff suffered from an actual qualifying disability, Defendants treated her eye condition as such, and engaged in an "interactive process" with Plaintiff to implement reasonable accommodations.[23] *Anthony*, 955 F.3d at 1134. Plaintiff even concedes that Defendants furnished every single one of her requests to accommodate her eye condition. Berg Decl. Ex.1, at 69–75. The only "accommodation" that Defendants did not implement was Plaintiff's demand for a new supervisor, which, as a matter of law, is not a reasonable accommodation. *Roberts*, 690 F. App'x at 536. No reasonable jury could find that Defendants failed to accommodate Plaintiff's eye condition. The Court grants summary judgment on Plaintiff's Third and Seventh Claims.

## CONCLUSION

---

[23] *See* Lafky, Decl. Ex. 14. ("After that time, Neel and I will meet with you again to discuss how this accommodation is working, whether Finisar can continue to offer you this accommodation, and whether there may be some other available accommodation that Finisar can offer to you").

Defendants' Motion for Summary Judgment (ECF No. 62) is GRANTED in full.

Plaintiff's claims are dismissed with prejudice.

IT IS SO ORDERED.

Dated this 25th day of May, 2023.

_____/s/ Michael McShane_____
Michael McShane
United States District Judge