IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| HUI XU, *an individual*, | Case No. 6:20-cv-01201-MC |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| LIGHTSMYTH TECHNOLOGIES, INC., *a Delaware Corporation*, *and* FINSAR, *a Delaware Corporation*, | |
| Defendants. | |

_____

MCSHANE, Judge:

Plaintiff Hui Xu brings this employment action against Defendants LightSmyth Technologies, Inc., and Finisar Corporation, asserting claims of discrimination, retaliation, hostile work environment, wrongful discharge, and failure to provide reasonable accommodation. Compl. ¶¶ 44–62, ECF No. 1. Following an appeal to the Ninth Circuit, the only remaining claims before this Court are Title VII discrimination and retaliation claims and Oregon state law whistleblower and retaliation claims. Defendants now move for summary judgment post-remand. Defs.' Post-Remand Mem., ECF No. 100. Because Plaintiff has not shown she suffered adverse action in the

workplace, and because she cannot connect the alleged employment action to a protected status, Defendants' Motion is GRANTED.

## BACKGROUND

LightSmyth is a manufacturing company and subsidiary of Finisar Corporation based in Eugene, Oregon. Compl. ¶ 2. In January of 2012, Plaintiff began working for LightSmyth as a Manufacturing Technician and was later promoted to Supply Chain Manager. Compl. ¶¶ 10–11. While at LightSmyth, Plaintiff earned a reputation for being a difficult coworker and employee; her former colleagues describe her as confrontational, defensive, insulting, and incapable of accepting criticism. Berg Decl. Ex. 2, at 8, ECF No. 63; Berg Decl. Ex. 5, at 4 ("[S]he was confrontational. She liked to yell and scream repeatedly."); Berg Decl. Ex. 24, at 2 ("If it's a job that she doesn't like . . . she started getting very argumentative and she would insult people."). Despite her own problematic behavior, Plaintiff frequently reported trivial personal disagreements with her coworkers to Human Resources, often characterizing her work environment hostile, toxic, and discriminatory, based on her protected status as a 65-year-old Asian woman. *See e.g.*, Berg Decl. Ex. 18, at 1, 11; Compl. ¶ 7. Plaintiff estimates that she made about 80-100 reports to HR during her employment. Berg Decl. Ex. 1, at 62.

Plaintiff's complaints escalated in June of 2016, when Defendants assigned Catherine Brown as Plaintiff's new supervisor. Compl. ¶ 17. Their relationship was strained from the beginning; Plaintiff repeatedly voiced her opinion that Ms. Brown was unqualified to supervise Plaintiff and her peers. *See* Berg Decl. Ex. 1, at 40; Ex. 29, at 1 (Plaintiff stating in a letter to CEO Chuck Mattera that Defendants "assigned an obviously unqualified, poorly educated Caucasian woman to supervise the new person."). Plaintiff also had a tense relationship with her "Clean Room Lead," Liza Dayton ("Lead Dayton"), who Plaintiff describes as "rude and disrespectful toward

Plaintiff but not to [her] male colleagues." Compl. ¶ 22. Lead Dayton averred that Plaintiff often became "very argumentative" and would insult Dayton when she was assigned to a task she disfavored.[1] Berg Decl. Ex. 24, at 2–3 ("Every time there's a job that she doesn't like, she will start saying that she's being harassed, and she's being attacked.").

In November of 2016, Defendants formally disciplined Plaintiff for slapping Lead Dayton in the buttocks several times in front of their coworkers. Berg Decl. Ex. 1, at 78. Rather than terminate Plaintiff for sexual harassment, Defendants reviewed the company code of conduct with Plaintiff, issued a "Performance Assessment & Improvement Plan," and warned Plaintiff that any further misconduct would result in "further disciplinary action, up to and including termination." *Id.* Plaintiff contends that the company "knew or should have known that Plaintiff and others engaged in horseplay in the workplace," that her supervisors unfairly targeted Plaintiff,[2] and that "Defendants' disciplinary action chilled Plaintiff's complaints for a couple months." Compl. ¶ 21.

Around this same time, Plaintiff reported that she was having difficulty with her eyes and requested a magnifying glass to help her label products. Berg Decl. Ex. 1, at 68. Defendants provided this accommodation immediately. *Id.* ("Q. They gave you a magnifying glass when you requested one without delay, correct? A. Correct."). Then, in April of 2017, Plaintiff submitted a doctor's note stating that Plaintiff suffers from "cataract and dry eye" and that she would need "frequent breaks from looking through the microscope and should be excused from looking through the scope for continuous periods greater than 30 minutes." Lafky Decl. Ex. 5, at 1, ECF

---

[1] *See* Berg Decl. Ex. 24, at 3 ("Q. What did [Plaintiff] say to you that you found insulting? A. She called me stupid. She would insult me by calling me stupid many times. She would tell me that I'm uneducated. And she would keep going that she was — you know, she went to a very prestigious school in China, that she supervised 500 students in China and that she would teach the teachers in China. And I was nothing compared to her, and she would go on and on about that.").
[2] Plaintiff alleges that on a previous occasion, Lead Dayton choked Plaintiff and slapped her in the buttocks. Compl. ¶ 21. Plaintiff has not provided any evidence to substantiate this claim.

3 – Opinion and Order

No. 80. Defendants accommodated this request and adjusted Plaintiff's break schedule accordingly.[3] Berg Decl. Ex. 1, at 69.

Over the next year, tensions between Plaintiff, Supervisor Brown, and Lead Dayton escalated. On February 25, 2018, Plaintiff wrote to General Manager Gil Cohen by email, detailing what she perceived as "prima facie examples of abuse of power, retaliation, and discrimination." Lafky Decl. Ex. 20, at 2. Plaintiff's grievance involved her disagreements with Lead Dayton about her product packaging duties. *Id.* Plaintiff also alleged that Brown and Lead Dayton conspired to "make her life as difficult as possible at LightSmyth." *Id.* In this email, Plaintiff requested a new supervisor "who is reasonable and appreciates my contributions." *Id.* In response to Plaintiff's complaint, Neel Dhar, Finisar's Senior HR Manager, flew to Eugene from San Jose, California to interview Plaintiff, Lead Dayton, Brown, and several other employees. *See* Berg Decl. Ex. 37, at 1. On March 27, 2023, Ms. Dhar notified Plaintiff that based on the inconsistencies in Plaintiff's interview, Ms. Dhar was "unable to substantiate" Plaintiff's claims. *Id.*; Berg Decl. Ex. 27, at 6.

### A. **March–April 2018 Restructuring of Plaintiff's Job Duties**

On March 15, 2018, Plaintiff requested further accommodation for her vision and submitted a second doctor's note indicating that she was "not able to perform visual inspection of subtle surface defects." Lafky Decl. Ex. 5, at 2. Since, according to Defendants, visual inspection was an essential function of Plaintiff's duties, Defendants decided to restructure her role. Berg Decl. Ex. 39, at 1. On March 26, 2018, Plaintiff's title changed from "Supply Chain Manager" to "Manufacturing Technician," which also reclassified her from an overtime-exempt, salaried employee to a non-exempt, hourly employee. *Id.* Plaintiff's primary duties as a Manufacturing

---

[3] See Berg Decl. Ex. 1, at 69 ("And it's true, is it not, that Finisar promptly made an accommodation consistent with the recommendation of your written doctor's note? A. Yes. Q. Do you contend that Finisar/LightSmyth failed to in some way accommodate your alleged eye disability in this time frame? A. No.").

Technician included "packaging all outgoing shipments," "optical efficiency of standard material supply and customer gratings," and "loading and unloading the parts washer." *Id.* Supervisor Brown advised Plaintiff,

> We will restructure your role as described above as an accommodation to you and will "try out" the restructured position for a period of one month. After that time, Neel [Dhar] and I will meet with you again to discuss how this accommodation is working, whether Finisar can continue to offer you this accommodation, and whether there may be some other available accommodation that Finisar can offer to you.

*Id.* Defendants also promised to work with IT to adjust the font size of the OE station monitor and to provide Plaintiff with special safety glasses equipped with magnifying lenses. *Id.* at 2. After 30 days, the accommodation seemed to be working, and Plaintiff's new role was made permanent on April 26, 2018. Lafky Decl. Ex. 14.

### B. May 2018 Annual Performance Review

On May 8, 2018, Plaintiff received her annual performance evaluation from Supervisor Brown. Berg Decl. Ex. 40, at 1–3. The report indicated that Plaintiff "met expectations" in every category and "exceeded expectations" in the "commitment to quality" category. *Id.* at 1–2. In the "goals and objectives" section, Supervisor Brown opined that Plaintiff could work on "packaging single pieces in 5 minutes or less" and should "[c]ontinue to work on clear communication with lead and manager." *Id.* at 2. Plaintiff avers that the suggestion to increase her productivity was "one of the most offensive and hostile occurrences that happened" during her employment. Berg Decl. Ex. 1, at 98.

### C. October 2018 Admonition About Respecting Coworkers

On October 2, 2018, after another employee notified management that several "Accelink wafers" showed signs of dripping and 'significant walk off," Lead Dayton suggested in an email

that Plaintiff might be responsible for the wafer walk off. Berg Decl. Ex. 17, at 3–4 (Lead Dayton stating, "I didn't change the set up that Hui's been working this morning[.] I wonder if this is the problem that she is having of significant walk off."). Plaintiff was deeply offended by Lead Dayton's statement, and in a follow-up email to Supervisor Brown, accused Lead Dayton of lying, attacking her, and damaging her reputation. *Id.* at 1. On October 15, 2018, after Supervisor Brown received reports that Plaintiff told several coworkers that "Liza [Dayton] lied in the email," Supervisor Brown set up a meeting with Plaintiff to discuss Finisar's policy against spreading rumors and disrespecting coworkers. Berg Decl. Ex. 43. Plaintiff described this meeting as "hostile and offensive" and alleged that Supervisor Brown treated her "inhumanly [sic]" based on Supervisor Brown's "tone and mannerisms," by "deny[ing] all of the facts," and by prohibiting Plaintiff from discussing the email with anyone else. Berg Decl. Ex. 1, at 605–07. Plaintiff also stated that Supervisor Brown used her "maximum power to protect the defamation [of Plaintiff]." *Id.* at 607.

### D. November 2018 Offer of Severance

On November 1, 2018, Plaintiff provided Defendants with a third doctor's note and accommodation request. Lafky Decl. Ex. 8, at 9. In the note, Dr. Jane Mossberg, M.D.,[4] stated that she treated Plaintiff for hypertension, depression, anxiety, and shingles, and that these conditions were "severely exacerbated by the work harassment [Plaintiff] has been having to tolerate." *Id.* Dr. Mossberg opined that Plaintiff's position should be changed to "avoid certain harassing co-workers and managers." *Id.* Defendants denied this request. On November 11, 2018, Plaintiff made another complaint to Neel Dhar and again requested a new supervisor. Defs.' Post-Remand Mem. at 33–34. Ms. Dhar then called Plaintiff and explained that she has already looked into the

---

[4] Jane Mossberg is the ex-wife of Tom Mossberg, former LightSmyth CEO, and Plaintiff's close friend. Lafky Decl. Ex. 24, at 1.

allegations of harassment, that Finisar had made every reasonable accommodation for Plaintiff's eyes, and that they would not issue Plaintiff a new supervisor. Berg Decl. Ex. 27, at 8. Ms. Dhar also suggested that if Plaintiff was unhappy working for the company, the company could offer Plaintiff a severance package, and that the decision was up to her. *Id.* at 8–10. ("Q. What was her response to that? A. Like I said to her, I don't want an answer from you, think about it. She was thankful. She said, okay, I will think about it and let you know. Q. Was there ever a specific severance package offered? A. No, we just talked about it.").

In an email to Ms. Dhar two days later, Plaintiff stated, "I am very sad that Finisar has decided to offer me a package to force me out of the employment with the company." Lafky Decl. Ex. 8, at 8. Plaintiff also accused Ms. Dhar of stating that Plaintiff's harassment-related health conditions were Plaintiff's problem, rather than the company's.[5] *Id.* In response, Ms. Dhar reminded Plaintiff that the decision to leave was completely up to her. Berg Decl. Ex. 45. She also suggested that Plaintiff could take a leave of absence for her health as another option.[6] *Id.*

### E. **Plaintiff and Defendants Part Ways**

On February 4, 2019, Plaintiff requested paid time off to take care of her terminally ill sister and Defendants immediately granted this request. Berg Decl. Ex. 1, at 42–45. After Plaintiff maximized her PTO days, she notified Defendants that her "situation [was] not changing" and requested six months of unpaid leave. Berg Decl. Ex. 47, 49. HR specialist Jessica Pastor informed Plaintiff that caring for her sister was not a qualifying event under the Family Medical Leave Act ("FMLA"), however, Finisar would provide Plaintiff with an additional 30 days of unpaid leave.

---

[5] Ms. Dhar has consistently denied making this statement. Beg Decl. Ex. 27, at 10; Berg Decl. Ex. 45.
[6] In her response to Plaintiff, Ms. Dhar stated that the "C`ompany wanted to give you the option to leave and seek employment elsewhere, while providing you with some financial security as you sought a new opportunity. We have no desire to push you out; indeed, as I mentioned in my last email, Catherine thinks you are doing good work in your role as a Technician. The decision to accept or reject that package was entirely up to you, and now that you have declined the severance package, we will not discuss it further." Berg decl. Ex. 45, at 1.

7 – Opinion and Order

Berg Decl. Ex. 49; Ex. 51, at 1. Ms. Pastor also explained that 30 days was the maximum number of days allowed under the company policy[7] and that if Plaintiff did not return to work on March 25, 2019, "we will be unable to hold your job and will assume that you have voluntarily resigned from your position." *Id*. Plaintiff accepted the proposal, and on March 24, 2019, Plaintiff informed Ms. Pastor that she would not be returning to work and that she had cleared out her locker. Berg Decl. Ex. 48, at 1.

The following month, Plaintiff filed a complaint with the Oregon Bureau of Labor and Industries ("BOLI") alleging that she was subject to (1) discrimination based on her race, national origin and disability, (2) retaliation, (3) workplace harassment, (4) wrongful termination, and (5) that Defendants failed to accommodate her disability. Berg Decl. Ex. 52, at 2. BOLI dismissed Plaintiff's complaint for "lack of substantial evidence linking the alleged harm to [Plaintiff's] membership in a protected class." Berg Decl. Ex. 54, at 2. Plaintiff then filed this case, alleging identical claims. *See generally* Compl.

### F. Procedural History

On May 25, 2023, this Court granted Defendants Motion for Summary Judgment on all claims. Op. & Order, ECF No. 90. On June 19, 2023, Plaintiff appealed this Court's decision to the Ninth Circuit. Appeal, ECF No. 92. On October 24, 2024, the Ninth Circuit remanded for the Court to consider Plaintiff's Title VII discrimination and retaliation claims, and her state-law whistleblower and retaliation claims. *Xu v. LightSmyth Techs., Inc.*, No. 23-35423, 2024 WL 4562748 (9th Cir. Oct. 24, 2024). Specifically, the Ninth Circuit asked this court to review its

---

[7] Finisar's 'personal leave of absence' policy states:
> Under special circumstances, employees with at least one year of employment may be granted a leave of absence without pay when the employee has no other leave available to them. The granting of this type of leave is normally for compelling reasons and requires the manager's approval, which may be granted or withheld for any reason. *Leaves may not exceed one month*…

Berg Decl. Ex. 50, at 21 (emphasis added).

8 – Opinion and Order

original order in light of a more recent Supreme Court case, *Muldrow v. City of St. Louis*. 601 U.S. 346 (2024). The Ninth Circuit affirmed this Court's decision on all other claims. *Id.* Defendants now move for post-remand summary judgment on the remaining claims.

## LEGAL STANDARD

On a motion for summary judgment, the moving party bears an initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine" dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute is considered "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)).

## DISCUSSION

### I. Title VII Discrimination Claim

#### A. Applicable Standard

Discrimination claims are subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*. 411 U.S. 792, 802–04 (1973). First, Plaintiff must establish a *prima facie* case of discrimination by showing: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside of her protected class were treated more favorably. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). Next, the burden shifts to the employer to articulate a

legitimate, nondiscriminatory reason for the alleged disparate treatment. *Id.* at 1091. Finally, the employee must offer evidence that the employer's proffered legitimate, nondiscriminatory reason for the alleged disparate treatment is a pretext for discrimination. *Id.*

In *Muldrow v. City of St. Louis*, the U.S. Supreme Court held that establishing an adverse employment action for a Title VII discrimination claim requires that a plaintiff show a defendant employer's action caused "some harm respecting an identifiable term or condition of employment," not that the harm incurred was "significant." *See* 601 U.S. 346, 355, 359 (2024) ("Muldrow need show only some injury respecting her employment terms or conditions."). Indeed, while the *Muldrow* court found the plaintiff had adequately established an adverse action even though "her rank and pay remained the same," the Court identified specific ways the defendant employer's actions "left [the plaintiff] worse off several times over," and circuit courts have since continued to find trivial changes to a plaintiff's conditions of employment are insufficient to support a claim for discrimination. *Id.* at 359; *see e.g.*, *Yates v. Spring Indep. Sch. Dist.*, 115 F.4th 414, 420 (5th Cir. 2024) (finding reassignment insufficient to leave plaintiff "worse off" with respect to the terms and condition of his employment); *Rios v. Centerra Grp. LLC*, 106 F.4th 101, 112–13 (1st Cir. 2024) (finding that prohibiting plaintiff from eating at his post and parking his car or changing his clothes in certain places, and failing to provide plaintiff with pointers at an off-duty shooting range practice session, did not cause "some harm").

### B. Plaintiff's Claims

Here, there is no dispute that Plaintiff belongs to a protected class under Title VII and was qualified for her position. At issue is whether Plaintiff was subject to an adverse employment action. *See* Pl.'s Resp. Def.'s Post-Remand Mem. 3–4, ECF No. 104. Plaintiff asserts she suffered injuries to the terms and conditions of employment under the *Muldrow* standard. *Id.* Plaintiff lists

several individual instances of alleged acts of discrimination that she states give "context" to her claims of adverse actions. *Id.* Plaintiff refers to "treatment" that, together with its "follow-on impacts," resulted in a cumulative injury that "far exceeds" the *Muldrow* standard. *Id.* at 4. But an aggregate view is not appropriate here. *See Retherford v. Portland Pub. Sch.*, 2019 WL 7879880, at *14 (D. Or. Dec. 3, 2019) ("[W]hile the Court is mindful that context matters, and will consider actions together when one is alleged to have caused the other, it declines plaintiff's invitation to simply view these events in the aggregate absent any specific hostile work environment claim."), *report and recommendation adopted as modified*, 2020 WL 168853 (D. Or. Jan. 13, 2020).

Plaintiff blends incidents related to protected characteristics with others related to disability, refers vaguely to "formal discipline," and neither connects the sum of these incidents to her claim of discrimination nor explains why it amounts to adverse action. Pl.'s Resp. Defs.' Post-Remand Mem. 3–4; *see also Somoza v. Univ. of Denver*, 513 F.3d 1206, 1219 (10th Cir. 2008) (finding "negative comments, condescending looks, perceived exclusion from hiring and firing decisions, and a reduction in the administrative authority," when aggregated, did not constitute "material and adverse actions"). Instead, the Court proceeds by analyzing the specific instances of alleged adverse actions it previously addressed: the change in title and job duties, the May 2018 performance review, and the November 2018 offer of severance.[8]

### 1. <u>Change in Title and Job Duties</u>

Assuming without deciding that this act occurred within the statutory period, Plaintiff's claim fails because a reasonable jury could not find that Plaintiff's change in title and job duties

---

[8] The Court also considered a claim based on Plaintiff being admonished to respect her coworkers on October 15, 2018. Pl.'s Resp. 19; Op. & Order 15–16. Neither party addresses this incident here and the Court need not reconsider its previous holding under *Muldrow*, having held that no employment action took place in the first place. Op. & Order 15–16. Plaintiff was never formally reprimanded, and because an adverse action requires some tangible employment action "such as hiring, firing, failing to promote, reassignment . . . , or a . . . change in benefits," the Court never reached the question of harm. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Summary judgment for Defendants on a Title VII discrimination claim arising from this incident remains appropriate.

11 – Opinion and Order

was an adverse action under *Muldrow*. First, Plaintiff's insistence on labelling her change in role as a "demotion" does not create a genuine issue of material fact. *Wakefield v. Providence Health Sys., Or.*, 2002 WL 1263977, *7 (D. Or. June 7, 2002) ("[a]n employee's subjective belief that he suffered discrimination does not raise a genuine issue of material fact sufficient to survive summary judgment") (citations omitted), *aff'd*, 80 Fed. App'x. 24 (9th Cir. 2003). *See generally* Pl.'s Resp. Defs.' Post-Remand Mem 6–8. Aside from her belief, Plaintiff provides no evidence as to why her new title is worse. *Id*.

Plaintiff's change in job duties was not an adverse action because it was a result of Plaintiff's request for an accommodation where she would not be required to "perform visual inspections." Berg Decl. Ex. 39. Plaintiff nevertheless argues her work became more burdensome. Pl.'s Resp. Defs.' Post-Remand Mem 3. To be sure, "assigning more, or more burdensome, work responsibilities, is an adverse employment action." *Davis*, 520 F.3d at 1089. But even if Plaintiff's new role imposed burdens on her that her prior role had not, any such changes cannot amount to an adverse action here because Plaintiff's new role was *less* burdensome in the way she specifically requested. *Cf. Laird v. Fairfax County*, 978 F.3d 887, 894–95 (4th Cir. 2020) (finding where defendant employer "agree[d] to provide, and [the plaintiff] agree[d] to accept, a lateral transfer" to a specific position identified by defendant employer, transfer could not constitute actionable adverse action (some alterations in original)); *Monfils v. Weston Inv. Co. LLC*, 2018 WL 1585779, at *4 (D. Or. Mar. 30, 2018) (finding plaintiff's "allegations that he was assigned tasks beyond his physical capabilities after having informed his supervisor of his limitations and being given a description of the job that was within his capabilities" sufficient to establish adverse action). Indeed, a failure on behalf of Defendants to accommodate Plaintiff's request could have constituted an adverse employment action in this context. *See Kerkering v. Nike, Inc.*, 2023 WL

12 – Opinion and Order

5018003, at *4 (D. Or. May 30, 2023) (citing *Knox v. City of Portland*, 543 F. Supp. 2d 1238, 1247 (D. Or. 2008)), *report and recommendation adopted*, 2023 WL 4864423 (D. Or. July 31, 2023).

Moreover, the harms Plaintiff identifies connected to her change in duties do not establish an adverse action here. *See* Pl.'s Resp. Defs.' Post-Remand Mem. 3–4. Plaintiff states she was moved from her individual cubicle to a shared cubicle with access to a locker for her belongings, like other Manufacturing Technicians, but this is the kind of inconvenience that does not leave her "worse off" under *Muldrow*. *Cordova v. Textron Aviation, Inc.*, 2025 WL 1262487, at *7 (D. Kan. Apr. 30, 2025) (citing *Muldrow*, 601 U.S. at 359) (noting *Muldrow*'s requirement of "some harm" excludes "mere inconvenience" or changes that "make[] an employee unhappy" from its standard for adverse action). Other harms Plaintiff identifies cannot be ascribed to her change in title or role. Plaintiff asserts she was harmed by Defendants refusing her breaks and monitoring her breaks in her new role, pointing to communications she received in response to her concerns. *See* Pl.'s Resp. Defs.' Post-Remand Mem., 3, 7; Lafky Decl. Ex. 4, 14. However, Plaintiff's complaints after her reassignment represent, in substance, a continuation of a pattern of complaints predating her reassignment.[9] Pl.'s Resp. Defs.' Post-Remand Mem. 6. Likewise, as to Defendants requiring Plaintiff use "remnant packaging," the undisputed evidence, including Plaintiff's previous complaints, indicate Plaintiff's change in job duties did not cause this.[10] *Id.* at 4. As such, because the undisputed facts show Plaintiff complained of the same conditions prior to her reassignment,

---

[9] *See, e.g.*, Berg Decl., Ex. 33, at 2 (Plaintiff reporting to Lead Dayton, on November 14, 2016, "[a]nother incident troubles me is that I was required to always tell you I need to go and use the bathroom before leaving the [clean room]"); Berg Decl., Ex. 15 (accusing Lead Dayton of being "abusive" in May 2017 in response to disagreement about break time); Lafky Decl. Ex. 8, at 1 (emailing management in July 2017 stating she should "have more flexibility in [her] schedules to come and go (to the bathroom or take break[s])"); Lafky Decl. Ex. 25, at 39 (Dayton informing Brown on March 15, 2018 about a discussion with Xu about her breaks).

[10] *See, e.g.*, Berg Decl., Ex. 18, at 9–10 ("On Sep 28, 17, [Lead Dayton] again warned me 'You are not allowed to use the ready-made package slip unless you have used up the remnants', I asked [Lead Dayton] if she had talked to Ms. Catherine B[rown] about this is a lot harder, much more work, much longer time."); Berg Decl., Ex. 37 (stating Plaintiff was responsible for packing "[f]or over a year" as of February 2018).

a reasonable jury could not find these conditions were caused by her change in title, job duties, or reclassification to an hourly non-exempt employee. *Id.*

### 2. May 2018 Performance Review

Plaintiff's May 2018 performance review also does not reach the level of an adverse action. An undeserved performance review may constitute a cognizable adverse employment action. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). However, "[a] low performance evaluation which does not affect the employee's work does not amount to an adverse employment action." *Hess v. Multnomah County*, 216 F. Supp. 2d 1140, 1154 (D. Or. 2001). Here, Plaintiff's performance review contained more positive comments than it contained negative feedback or constructive criticism. Berg Decl., Ex. 40 (performance review rating Plaintiff's performance as either "met expectations" or "exceeded expectations" in every category, and that Plaintiff's "overall performance" met expectations); *see also* Berg Decl. Ex. 41 (Plaintiff objecting to review's method). The undisputed facts include no suggestion this review was undeserved or that it was any more negative than previous reviews. *See generally* Berg Decl., Ex. 40; Ex. 57.

### 3. November 2018 Severance Offer

Finally, Plaintiff did not suffer an adverse action based on the November 2018 offer of a severance package. Contrary to Plaintiff's characterization of the severance offer as an attempt to "force" her out of the company, the undisputed facts show it was made clear to Plaintiff that the offer was non-binding, was one of multiple options, the choice was up to Plaintiff, and Plaintiff could continue her employment with Defendants following the offer, which she did. *Compare* Lafky Decl. Ex. 8, at 8, *with* Berg Decl. Ex. 45 (HR Manager Dhar's email), *and* Berg Decl. Ex. 27 8–10 (HR Manager Dhar's deposition). *See Hoang v. Wells Fargo Bank, N.A.,* 724 F. Supp. 2d 1094, 1104 (D. Or. 2010) (finding warning letter that did not implement change in terms and

conditions of the plaintiff's employment was not an adverse employment action). Moreover, Plaintiff's repeated request for a new supervisor that prompted the offer has been deemed *per se* unreasonable. *Roberts v. Permanente Med. Grp., Inc.*, 690 F. App'x 535, 536 (9th Cir. 2017) (*Memorandum Disposition*) (discussing EEOC guidelines).

### 4. Lack of Evidence of Discrimination

Even if she could show an adverse employment action, Plaintiff fails to connect such an action to her membership in a protected class. *Muldrow* did not disturb the requirement that a Title VII Plaintiff must show that a defendant employer's action that made them "worse off" was "based on" a protected characteristic. *See* 601 U.S. at 359. Plaintiff provides no evidence, for instance, that her non-female Caucasian coworkers received *better* accommodations for medical conditions or *better* reviews than she did. Plaintiff's passing reference to a remark about her "high-pitched voice" in her Response is not connected to any of the specific allegations of adverse actions at issue. Pl.'s Resp. Defs.' Post-Remand Mem. 3. As to the offer of severance, Plaintiff's evidence for discrimination in the form of a single instance of a senior employee referring to Plaintiff by the wrong name, which occurred after the offer, is likewise inadequate. Lafkey Decl. Ex. 24, at 2 (December 17, 2018 email by HR Director Sheila Roberts). .

Because Plaintiff has failed to show how her change in title and job duties, the May 2018 performance review, or the November 2018 severance offer caused her "some harm" that can be tied to her membership in a protected class, Plaintiff's Title VII discrimination claims fail and the Court grants summary judgment for Defendants on these claims.

## II. Title VII Retaliation Claim

Claims for retaliation follow to the same *McDonnell Douglas* burden-shifting analysis as discrimination claims. To establish a *prima facie* claim for retaliation, an employee must establish

15 – Opinion and Order

(1) her involvement in protected activity, (2) an adverse employment action, and (3) a causal link between the two. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2001). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 970. Finally, the employee must offer evidence that employer's proffered legitimate, nondiscriminatory reason for the alleged adverse employment action is a pretext for retaliation. *Id.*

      Plaintiff fails to establish a prima facie case here. Defendants do not dispute Plaintiff engaged in protected activity. At issue is whether Plaintiff was subject to adverse employment actions and whether there is a causal link between Plaintiff's protected activity and the adverse employment action. Unlike discrimination claims post-*Muldrow*, to constitute an adverse action for a retaliation claim an employer must cause the plaintiff "significant harm." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006); *see Muldrow*, 601 U.S. at 348. This test is objective and "was meant to capture those (and only those) employer actions serious enough to "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57.

      Plaintiff's asserted injuries are insufficient to establish a prima facie case of retaliation. Plaintiff argues that the change in her job title to Manufacturing Technician left her with a less prestigious title, resulted in non-exempt status, and resulted in a change of her job duties. Pl.'s Resp. Defs.' Post-Remand Mem. 6–7. For the same reason that Plaintiff's claims fail to meet the lower standard for adverse action under *Muldrow*, Plaintiff also fails to establish adverse action for retaliation under *Burlington*. *See Luox v. Maire*, 337 Fed. App'x 695, 697 (9th Cir. 2009) ("[T]wo reprimands and new work performance standards . . . did not rise to the level of adverse employment actions[.]"); *see also Thompson v. Secretary, U.S. Dep't of Veterans Affairs*, 801 Fed.

16 – Opinion and Order

App'x 688, 693 (11th Cir. 2020) (affirming summary judgment where plaintiff characterized reassignment as a loss of prestige or responsibility). As discussed, Plaintiff's change of duties was an accommodation as requested by the Plaintiff. Indeed, any circumstantial evidence of causation drawn from the temporal proximity between Defendants' change to Plaintiff's job duties and Plaintiff's protected activity is overcome by the fact Plaintiff requested an accommodation in the intervening time. Pl.'s Resp. Defs.' Post-Remand Mem. 8–9; Berg Decl. Ex. 38, 39; Lafky Decl. Ex. 5, at 2; *see Kama v. Mayorkas*, 107 F.4th 1054, 1060 (9th Cir. 2024) (citing *Curley v. City of North Las Vegas*, 772 F.3d 629, 634 (9th Cir. 2014)) (stating when "an adverse action follows on the heels of *both* a protected activity *and* an independent reason for adverse action . . . [temporal proximity] might not be enough standing alone to establish pretext" to show causation for Title VII retaliation claim (emphasis in original)).

Because Plaintiff fails to show that the change in title and job duties, the May 2018 performance review, or the November 2018 severance offer resulted in "significant harm" to Plaintiff and a causal link to her protected activity, Plaintiff's Title VIII retaliation claims fail and the Court grants summary judgment for Defendants on these claims.

### III. State-law Claims

Upon remand, the Ninth Circuit directed the Court to analyze Plaintiff's claim under ORS § 659A.199 (the whistleblower statute) separately from Plaintiff's claim under ORS § 659A.030(1)(f) (the retaliation statute), noting the standards applicable to each claim can produce different results. *See e.g.*, *Lindsey v. Clatskanie People's Util. Dist.*, 140 F. Supp. 3d 1077, 1097 (D. Or. 2015). Because Plaintiff fails to establish an adverse action as to either claim, Plaintiff's remaining state law claims fail as well.

### A. Retaliation Under ORS § 659A.030

17 – Opinion and Order

Because § 659A.030 "was modeled after Title VII," such claims should be analyzed under the same framework. *Pool v. VanRheen*, 297 F.3d 899, 910 (9th Cir. 2002). Therefore, for the same reasons Plaintiff fails to establish her Title VII, as discussed, Plaintiff fails to establish a retaliation claim under § 659A.030(1)(f).

### B. Whistleblower Action Under ORS § 659A.199

To establish *a prima facie* case under § 659A.199, a plaintiff must prove that, (1) she engaged in a protected activity, (2) the employer subjected plaintiff to an adverse employment decision, and (3) there was a "causal link" between the protected activity and the adverse action. *Neighorn v. Quest Health Care*, 870 F. Supp. 2d 1069, 1102 (D. Or. 2012). Under § 659A.199, a plaintiff must have had "good faith" belief in the illegality of their reported conduct. § 659A.199(1). "The whistleblowing statute covers "only a subset" of the categories of conduct covered by the retaliation statute. *Summerfield v. Oregon Liquor Control Comm'n*, 472 P.3d 231, 782 (Or. 2020). "[S]pecifically, it covers conduct that relates to the 'terms, conditions, or privileges of employment.'" *Id.* at 782–83. The required showing of an adverse employment decision tracks the standard of harm from *Muldrow*. *See Xu*, No. 23-35423, 2024 WL 4562748, at *3; Defs.' Post-Remand Mem. 37. As discussed, Plaintiff fails to show harm under *Muldrow*. Plaintiff also fails to show a causal link between actionable protected conduct and alleged harm. Accordingly, Plaintiff has not established a whistleblower claim under § 659A.199.

18 – Opinion and Order

The Court grants summary judgment for Defendants on Plaintiff's state law claims.

## **CONCLUSION**

For the reasons stated above, Defendant's Post Remand Motion for Summary Judgment, ECF No. 100, is GRANTED.

DATED this 25th day of September, 2025.

                                            ___s/Michael J. McShane_____
                                                      Michael McShane
                                               United States District Judge